STATE OF LOUISIANA

VERSUS

JAKOREY WILLIAMS

NO. 20-KA-46

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 18,244, DIVISION "D"
HONORABLE M. LAUREN LEMMON, JUDGE PRESIDING

December 30, 2020

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and John J. Molaison, Jr.

**CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH**
**INSTRUCTIONS**
 **FHW**
 **SMC**
 **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Joel T. Chaisson, II
    Louis G. Authement

COUNSEL FOR DEFENDANT/APPELLANT,
JAKOREY WILLIAMS
    Jane L. Beebe

DEFENDANT/APPELLANT,
    Jakorey Williams
      In Proper Person

**WICKER, J.**

This case comes before us on appeal after Defendant Jakorey Williams (hereinafter "Defendant") was convicted of second-degree murder.

On November 19, 2017, the St. Charles Parish Sheriff's Office responded to a shooting in the 200 block of Meadows Drive in Destrehan, Louisiana. Officers located the deceased victim, Anthony Fletcher, in the driveway of 217 Meadows Drive. Defendant was on scene when officers arrived. Through the course of the investigation, detectives developed information that the victim had spent the night and morning leading up to the shooting socializing with Tyler Hill, Kentrell Smith, and Defendant before arriving at 217 Meadows Dr., where brothers Elijah and Jayedon Powell were present; furthermore, it was discovered that Defendant was with the victim immediately prior to the shooting. Pursuant to a search warrant, a .45 caliber firearm, the murder weapon, was found inside the residence at 217 Meadows. Defendant was seen exiting that residence after the homicide and could not be excluded as a major contributor to the DNA found on the gun. Moreover, blood spatter found on Defendant's jeans and shoes contained DNA profiles consistent with the DNA profile of the victim. Defendant was convicted of second-degree murder in violation of La. R.S. 14:30.1 in the 29th Judicial District Court of St. Charles Parish on April 24, 2019.

For the reasons fully discussed below, we affirm Defendant's conviction and sentence. However, because there are errors patent, we remand this matter to the district court, with instructions, to correct the uniform commitment order (UCO) to properly reflect that Defendant's sentence is to be served without benefit of probation, parole, or suspension of sentence.

## PROCEDURAL HISTORY

On July 18, 2018, a grand jury for St. Charles Parish returned a true bill, indicting Defendant with the second-degree murder of Anthony Fletcher in violation

of La. R.S. 14:30.1.  Less than a week later, on July 24, 2018, Defendant was arraigned and pled not guilty.

Also on July 24, 2018, Defendant filed a motion to suppress evidence.  On August 27, 2018, the State filed a motion to quash Defendant's subpoenas issued to lay witnesses, namely Ms. Erica Powell and Ms. Kawana Jones, for their appearance to testify at the suppression hearing.  On September 6, 2018, the trial court granted the State's motion to quash Defendant's subpoenas after a hearing.  The trial court held a three-day hearing on Defendant's motion to suppress evidence over the course of September 7, 2018; September 10, 2018; and October 19, 2018.  On November 5, 2018, Defendant filed a motion to require a unanimous jury verdict.  On December 4, 2018, the trial court denied Defendant's motion to suppress evidence and denied Defendant's motion to require a unanimous jury verdict.

On April 3, 2019, the State filed a motion *in limine* seeking to preclude Defendant from referencing, questioning, or mentioning prior arrests or other bad acts/character traits pertaining to witnesses testifying at trial.  After a hearing on this same date, the trial court granted the State's motion *in limine*.  On April 4, 2019, Defendant filed a "Notice of Intention to Apply for Writ of Certiorari."  Defendant's writ was denied by this Court on the same day.  *See State v. Williams,* 19-K-162 (La. App. 5 Cir. 4/4/19) (unpublished writ disposition).

On April 8, 2019, prior to jury selection, Defendant made an oral motion seeking to limit the expert testimony of Chief Timothy Scanlan, which the trial court denied after hearing arguments.  Jury selection then began on this same date.  Trial lasted for nine (9) days over which the State called twenty (20) witnesses, including three (3) experts;  Defense called five (5) witnesses.  Thereafter, on April 24, 2019, a twelve-person jury returned a unanimous verdict of guilty as charged.

On May 2, 2019, Defendant filed a motion for a post-verdict judgment of acquittal.  In the motion, Defendant argued that the evidence, viewed in a light most

2

favorable to the State, did not reasonably permit a finding of guilt beyond a reasonable doubt. Defendant argued the State did not exclude the reasonable possibility of another shooter nor did the State present evidence that satisfied the elements necessary to establish that Defendant was a principal to the murder. The motion was denied after a hearing on June 17, 2019.

On July 23, 2019, Defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On that same day, after sentencing, Defendant timely filed a motion for appeal, which was granted.

## FACTUAL HISTORY

Shortly before 8:00 a.m. on November 19, 2017, St. Charles Parish dispatch received two 9-1-1 calls reporting that a young man had been shot in the head and was lying in front of 217 Meadows Drive, Destrehan, Louisiana.[1] Upon arrival, Deputy Greg Cosse[2] saw Ms. Kawana Jones[3] and Defendant standing next to the victim. Deputy Cosse contacted Ms. Jones and established that she was one of the 9-1-1 callers[4]; he then asked a small group of people gathered across the street if anyone had seen anything. An unidentified woman allegedly stated that she had seen a man in an orange skull cap walking away.[5] Deputy Cosse relayed this

---

[1]  The recording of Ms. Iesha Payne's call was played for the jury. Ms. Payne testified that she was lying in bed when she heard the shots. She got up and went to her son's room to look out the window and saw the body lying in the driveway of 217 Meadows Drive. She called 911 as she headed downstairs; upon exiting her house, she saw Kawana Jones and Defendant coming outside as well.

[2] According to his trial testimony and the footage from his motor vehicle patrol unit recorder (MVR), which was also introduced at trial, Deputy Cosse was the first officer to arrive on scene at approximately 8:01 a.m.

[3] Ms. Kawana Jones lives at 208 Meadows Drive, directly across the street from 217. Upon hearing shots, Ms. Jones testified that she immediately flattened herself onto the bathroom floor. Ms. Jones stated that she thought she had stayed on the floor of the bathroom for up to ten minutes, but she also testified that she was the first person to exit her house after the shots were fired.

[4] Ms. Jones testified that after standing up, she went to the living room window to look outside, which was when she saw someone laying on the pavement. Ms. Jones then went outside but, after seeing the amount of blood, only made it to the middle of the street, and ran back to her apartment, stood in the yard, and kept screaming. She testified that is when Defendant came outside. Shortly thereafter, she re-entered her house to grab her phone and call the police. She never saw a car or any person going down the street and by the time she approached the body, there was no car in the driveway. She further testified that when she checked the victim, Defendant was behind her and stated that the victim was his friend; she was not paying attention to what Defendant was wearing or whether he was emotional.

[5] Detective Dewhirst testified that he had no information as to the identity of the person who made the report while on scene. Moreover, both Ms. Jones and Ms. Payne testified that they had not mentioned an orange skull cap to officers.

information to dispatch, and the description was broadcast over the radio while other officers were in route to the scene.

Deputy Cosse and Deputy Murray,[6] spoke with Defendant on the scene. Defendant informed the officers that the victim, his friend, went by the name "TC."[7] At trial, the jury saw MVR footage from that morning, wherein Defendant explained to the officers that he and TC were "chillin" on the sidewalk in front of 217 Meadows when Defendant went inside to get himself a beer and heard "pow, pow, pow," after which he came outside and saw TC lying there.[8] In the footage, Defendant indicated that the street was clear both before he went inside and once he came out again. Defendant also told officers that, the night before the murder, he and TC had been hanging around downtown New Orleans with some other individuals. When Deputy Cosse asked for specifics, questioning Defendant about whether he had been to Bourbon Street, Defendant confirmed that they had been "everywhere," including Bourbon Street.

Officers let Defendant know that detectives would want to speak to him. From that moment, MVR footage showed that Defendant requested to give a statement several times, questioning detectives as to when they would talk to him, even going so far as to stop Detective Jenni Barrette while she was walking past him in order to clarify whether she was a detective and could take his statement. While expressing a willingness to talk to detectives on the scene, Defendant simultaneously remained adamant that he did not want to sit and wait inside of a police car or be taken to headquarters to give a statement. Further, according to Deputy Cosse's testimony and MVR footage, there were also times when Defendant expressed that he wanted "nothing to do with this." When asked to describe Defendant's demeanor on the

---

[6] According to his testimony, Deputy Murray was the second officer on the scene.
[7] The investigation eventually revealed that the victim's legal name was Anthony Fletcher.
[8] Per Ms. Jones' testimony, Defendant had told various witnesses at the scene, including Ms. Payne, the same story.

4

scene, Deputy Murray testified that Defendant was emotionless and "nonchalant." Meanwhile Deputy Cosse testified that Defendant was upset and he did not want to be there; nevertheless, he also stated that Defendant was not crying or visibly upset about the victim's death. However, on cross-examination, Detective Cosse later admitted to having previously described Defendant as "distraught" in a prior hearing.

Per his testimony at trial, Detective Joseph Dewhirst, the lead detective assigned to the case, arrived on the scene shortly after 8:30 a.m. Upon arrival, Detective Dewhirst saw that the crime scene technician, Jason Troxler, was already in the process of marking and photographing the scene, including three .45 caliber shell casings that were visible near the body. Detective Dewhirst also spoke to several officers about what the investigation had revealed thus far.[9] Detective Dewhirst testified that Sergeant Walsh informed him that Defendant knew the victim and that Defendant told officers that he and the victim, as well as some others, had been hanging out downtown the night before and that they went to a Shell station shortly before the murder. Based on this information, Detective Dewhirst sent Sergeant Walsh to the Shell station to view the surveillance footage; Sergeant Walsh returned with screen shots of the Shell station surveillance video showing the victim, Defendant, and two unidentified individuals at the store approximately 45 minutes prior to the 9-1-1 calls.

MVR footage showed that, during the periods between (any two of) Defendant's conversations with various officers, Defendant wandered around the crime scene area wearing a wool beanie[10] and drinking a beer. Deputy Murray

---

[9] Defense argues that the investigation was poorly conducted because the investigating officers decided early on that Defendant was the shooter, and thereafter, proceeded to only collect evidence that would support a case against Defendant.

[10] The color of Defendant's beanie was highly contested. Most officers agreed with the defense that the beanie worn by Defendant at the scene looked yellowish-gold, yellowish-brown, or mustard-colored inside the courtroom and in evidence photos; however, many of those same officers testified that the beanie—which looked orange in the MVR footage—also looked orange in daylight. Nevertheless, Janae Smothers, a lay witness, testified that Defendant' beanie looked mustard colored everywhere except on the MVR footage. Further, Deputy Cosse, testified that the person giving the description did not indicate that Defendant—who was standing right there—was the person she saw walking away in an orange skull cap, and none of the other officers who heard the description while *en route* to the scene thought to

5

testified that Defendant smelled of alcohol and was slurring his speech, but Detective Dewhirst testified that Defendant was neither falling nor stumbling. [11] Approximately 15 minutes after officers arrived on the scene, Deputy Murray's MVR captured Defendant entering 217 Meadows and exiting less than a minute later. Shortly thereafter, when police had been on the scene for about 23 minutes, Defendant wandered beyond the police tape; Deputy Murray and Sergeant Brad Walsh went after Defendant and found him talking with a group of people who had gathered a couple of houses past the roped-off area.[12] The officers asked Defendant to return to the scene, and he immediately walked back with them. Thereafter, Defendant was ordered not to leave the immediate crime scene as detectives had an interest in interviewing him. Defendant obliged and continued to wait by Deputy Cosse's unit. While waiting near the car, Deputy Cosse's MVR captured Defendant repeating his story—he was inside getting a beer when he heard the shots—to a person who called him on the phone, whom he addressed as "Slick."

At approximately 9:00 a.m., after officers had been on the scene for nearly an hour, Deputy Cosse handcuffed Defendant and placed him into the back of his police unit despite Defendant's avid protests. Defendant remained in the unit until he was transported to headquarters approximately 30 minutes later. While Defendant sat in the car, officers continued to investigate the scene.

Detective Dewhirst testified that he had Detective Jody Weems knock on the front door of 217 Meadows, and Ms. Erica Powell responded. Sergeant Jeremy Pitchford joined Detective Weems shortly after Ms. Powell answered the door.

---

apprehend Defendant as a suspect based on the color of his hat. Further, Deputy Campuzano testified that he would have noticed if Defendant was wearing an orange skull cap at the scene, and that, had Defendant actually been wearing an orange skull cap, he would have immediately detained Defendant.

[11] Other witness testimony further suggests Defendant's intoxication. Ms. Jones stated that Defendant smelled like a "liquor store," and, at trial, when the Prosecutor asked if Defendant had shown any kind of emotion or if he appeared upset about the victim's death, Ms. Jones testified, "His eyes was [sic] wide open. [Defendant] was drunk."

[12] None of the officers questioned at trial remembered personally seeing Defendant enter or exit the apartment while on the scene.

Sergeant Pitchford, along with Detectives Jenni Barrette, Danny April, and Dewhirst, testified at trial to personally smelling marijuana while at the door. Likewise, Ms. Powell testified that she also smelled marijuana upon walking up to answer the door.[13] At trial, Ms. Powell stated that the detectives informed her that they smelled marijuana, but that they never spoke to her about the murder, nor did they ask for consent to search her home. She testified that the deputies told her they were getting a search warrant.[14]

At trial, Detective Dewhirst confirmed that Detective Jenni Barrette prepared a search warrant affidavit for 217 Meadows Drive and that a security sweep was conducted. Detective Thomas Plaisance testified that he was one of the officers who entered the apartment to perform a security sweep in anticipation of obtaining the search warrant. Ms. Powell, four of her children[15], including Elijah Powell and Jayedon Powell, and her infant niece were removed from the residence and waited outside while officers obtained and executed the warrant. As officers conducted the sweep, Deputy Cosse's MVR picked up comments that Defendant made from inside the unit, indicating that he could not understand why the Powells were letting officers enter the house.

After sitting in the police unit for some time, Defendant began to shout, "What is y'all doing with me?" and "Man, f*** y'all," as well as other similar phrases. Officer Cosse testified that he did not know at whom Defendant was yelling. Detective Dewhirst testified that, although the MVR picked up the statements clearly, because its microphone was located inside the vehicle, the statements were

---

[13] At trial, Ms. Powell testified that she had been in a "dead sleep" the morning of the murder, after leaving the house at 8:00 or 9:00 p.m. on Saturday night to go out with friends and returning drunk around 3:00 or 4:00 a.m. on Sunday, November 19, 2017. She testified that her daughter Kyla woke her up to tell her that the police were at the front door.

[14] Through her testimony at trial, Ms. Powell explained that she neither saw Defendant outside of her house that morning, nor did she see Defendant enter her house, and, further, that she was not informed that Defendant had entered the house.

[15] Ms. Powell has five children: Elijah Powell, Shaniece Hill, Kyla Bradley, Jayedon Powell, and Floyd . Ms. Powell's younger daughter's name was spelled "Kyla" and "Kayla" in the transcript. Upon review of the record, it appears Shaniece was not present on the day of the murder.

not easily heard or understood outside the vehicle. However, contemporaneous with Defendant's episode of screaming profanity, Detective Dewhirst walked away from a group of officers near the victim's body and told Deputy Cosse to take Defendant back to headquarters and to make sure he was shackled. Likewise, once Deputy Cosse arrived back at headquarters, he removed the handcuffs and shackled Defendant to the floor in an interview room.

Detective Dewhirst and Detective Plaisance interviewed Defendant at headquarters. The recorded interview began at approximately 10:00 a.m. During the interview, Defendant identified Mr. Tyler Hill and Mr. Kentrell Smith as the two unknown individuals from the screenshots of the Shell station video.[16]

Meanwhile, Detective Barrette was successful in obtaining a search warrant for the residence at 217 Meadows, and officers executed the search. Detective Danny April testified that he located a black firearm with a brown grip beneath the cushion of a sofa in the back of the residence near a set of sliding glass doors that opened into the backyard. There was no ammunition recovered at the scene; Detective April testified that the slide of the gun was locked back, as if the magazine, which was still in the gun, "had been run dry." Marijuana was also discovered during the search.[17]

About thirty minutes into the interview with Defendant, Detective Dewhirst received a text message from Sergeant Pitchford informing him that officers discovered a .45 caliber handgun during the search of 217 Meadows. Immediately thereafter, Detective Dewhirst read Defendant his rights and had him sign an advice of rights form.[18] Once Defendant had been read his rights, Detective Dewhirst

---

[16] Defendant called Mr. Smith, "Ken," and did not know his last name.

[17] Later that day, Crime Scene Technician Troxler returned to 217 Meadows to photograph and retrieve a bag of Coors beer cans as further evidence.

[18] The advice of rights form indicates that Defendant was advised of his rights at 10:00 a.m. However, Detective Dewhirst testified that Defendant was not advised of his rights until thirty minutes into the interview. According to both Detective Dewhirst and Detective Plaisance, Detective Dewhirst pre-filled in parts of the rights form prior to starting the interview and did not correct the time when the form was signed.

informed him that a gun had been found and explained where the gun was located. Defendant denied having any knowledge or information about the gun. He reiterated that he was inside the residence when shots were fired. Detective Dewhirst also recalled, "[Defendant] said when he went inside, that Jayedon was on the computer, and that he actually went in and kind of woke Elijah up, while he was inside." Defendant explicitly stated that he did not shoot the victim, and when detectives threatened to swab him for gunshot residue, he volunteered to take the test.[19] When detectives asked if "Slick," or any of the other individuals from the night before, had shot the victim and put the gun in the couch, Defendant stated that he did not know. The interview ended at approximately 10:45 a.m.

After interviewing Defendant, Detective Dewhirst sent Detective Plaisance and Sergeant Walsh to locate and interview Mr. Hill, while he went on to interview Jayedon Powell, who had been transported to headquarters along with the other occupants of 217 Meadows. At trial, Jayedon testified that he arrived at his mother's house around 7:00 p.m. or 8:00 p.m. on Saturday, November 18, 2017. Jayedon remembered being on the computer but claimed that it was in the middle of the night, before he went to sleep around "three-something" Sunday morning.[20] Jayedon did not recall seeing Defendant in the house while he was on the computer. However, Jayedon did remember smoking marijuana in the back room during the night with Defendant, the victim, his brother Elijah,[21] and "some light-skinned guy [Defendant]

---

[19] Although detectives had a conversation on scene concerning gunshot residue testing, Sergeant Pitchford, the investigation supervisor, testified that under his direction, gunshot residue testing was not performed in the instant case as he had previously decided not to do gunshot residue testing in any cases. Sergeant Pitchford's testimony was confirmed, at trial, by Detective Dewhirst. Further, although Detective Plaisance thought gunshot residue testing might have provided probative evidence, he agreed that gunshot residue can be easily removed from a person's skin. He confirmed that the division generally did not use gunshot residue testing, but he was not aware of any legitimate policy or directive against it. Nevertheless, Ms. Rauch indicated that findings regarding gunshot residue would not have had any bearing on her analyses as to whether casings and projectiles were fired from a particular weapon.

[20] Jayedon testified that at some point that morning he woke up again and went back to sleep around 6:00 a.m. or 7:00 a.m., before the murder.

[21] In his statement, Jayedon referred to his brother as "E," and at trial, he testified, that neither he nor anyone else, to his knowledge, calls Elijah "Slick."

9

had brought with him." According to Jayedon, an "older guy" showed up after everyone else and was also in the residence when they smoked.[22]

During his first recorded interview with Detective Dewhirst, Jayedon stated that he was asleep on the sofa in the back room when he heard the shots, and that he went to the front door and waited for a few moments before going back to sleep. At that time, he claimed he did not see anyone else in the apartment nor did he see anyone coming in or going out after hearing the shots. In his statement, Jayedon did not tell Detective Dewhirst that Defendant was involved in the murder or that Defendant had ever handled a gun in front of Jayedon. At trial, Jayedon testified that, during his interviews, Detectives only asked him questions about Defendant, not about Elijah, Mr. Smith, or Mr. Hill.

Detective Dewhirst testified that Jayedon was interviewed twice on the day of the murder and that one interview was not recorded. Jayedon's trial testimony provided that, on November 19, 2017, he attempted to tell detectives that he had touched the gun found at 217 Meadows. However, according to Detective Dewhirst, during the unrecorded interview conducted by Sergeant Pitchford, when Jayedon was told the murder weapon was found under the couch cushions on which he had been sleeping, Jayedon denied that his DNA would be on the gun until Sergeant Pitchford mentioned sending the DNA to the lab; then Jayedon tried to tell officers that his DNA may be on the gun. Sergeant Pitchford silenced Jayedon in order to read him his rights, after which Jayedon refused to speak further, and the interview ceased.

Detective Dewhirst also interviewed Elijah Powell on the day of the murder. Elijah told Detective Dewhirst that he was sleeping on the air mattress in the back of the house, and that he did not wake up when the shots were fired. Likewise, at trial, Elijah testified that he arrived at his mother's home around midnight on

---

[22] It appears from the record that the "light-skinned guy" is Tyler Hill and the "older guy" is Mr. Smith.

November 19, 2017, went to sleep on the air mattress in the back room as soon as he got to the house, and did not wake up until he heard screaming outside.

According to Elijah's testimony, when he heard the screaming outside, he ran upstairs to look out of his sister's bedroom window.[23] He did not actively look at the couch to see if anyone was sleeping on it, did not see Jayedon asleep on the couch, and, generally, did not see Jayedon until the police ushered everyone out of the house. He stated that Mr. Hill was not in the apartment when he awoke to the screaming.

Elijah also denied seeing or touching a gun or witnessing anyone else with a gun in the house that night. He testified he did not hear anyone talking and did not smell marijuana that night. He denied being outside during a discussion about going to the Shell station, and he testified that he did not see or hear others entering his mother's house on the morning of the murder, so he did not know how the gun got under the cushions. Elijah also denied seeing or hearing Defendant enter the house to get a beer.

When asked when he had last seen Defendant prior to the murder, Elijah initially stated he had last seen Defendant on the Friday before the murder; however, after reviewing his statement to police, he indicated that he had seen Defendant on Saturday, the afternoon leading up to the murder. Elijah testified he did not call Defendant after the police arrived and asserted that his nickname is not "Slick."[24] Elijah testified that he was not involved in the murder and had no information as to who was involved with the murder.

---

[23] Ms. Powell testified that she went into Kyla's room to look out the window when Kyla woke her up that morning. She did not see Elijah in Kyla's room. She testified at trial that she saw Elijah sleeping on the sofa in the front room as she was answering the door to speak with the officers. Elijah testified that he saw his mother for the first time that morning when the police were bringing them outside.

[24] While Jayedon testified that he had not heard Elijah called "Slick," Ms. Powell, Elijah's mother, testified that her son Elijah's nickname is "Slick," and Ms. Janae Smothers testified that she had known Defendant since he was a little boy, and she had known "Slick" since middle school or high school. She did not know Slick's real name, but testified that he was the brother of Shaniece Hill.

Detective Dewhirst testified that Jayedon and Elijah consented to provide DNA on November 19, 2017, the day of the murder. He testified that he obtained search warrants for the DNA of the female members of the Powell family at a later date. Detective Dewhirst testified that, on the day of the murder, Elijah and Jayedon were not considered suspects. There was no information linking them to the shooting, and nothing in the preliminary investigation led Detective Dewhirst to confiscate their clothing as possible suspects.

Ms. Powell gave a statement at 12:30 p.m. on the day of the murder. During that statement, Detective Dewhirst informed Ms. Powell, "I'm thinking [Defendant] put the gun under the couch with Jayedon sleeping on it. So, if that's the case and [Jayedon] doesn't tell us, he will be arrested for accessory after the fact to murder." Ms. Powell testified that she felt that her family was being threatened. The transcript of Ms. Powell's interview was not offered or admitted into evidence. Ms. Powell also testified that she could not remember the specifics regarding what officers had asked her during the interview.

Nevertheless, according to information brought out at trial, during her interview, Ms. Powell stated that Jayedon was asleep on the couch in the back room at the time of the murder. However, at trial, Ms. Powell admitted that she did not know whether Jayedon was asleep and did not personally see him on the couch. Ms. Powell indicated that neither Elijah nor Jayedon lived with her on November 19, 2017; however, on occasion, her sons visited and stayed at her home. She further testified that Defendant, who was friends with Elijah, would also visit her home and sometimes sleep there.[25] According to her testimony, after officers entered the house with the search warrant, they informed her that they had discovered marijuana and a

---

[25] Ms. Powell indicated that when Elijah, Jayedon, or Defendant stayed overnight at Ms. Powell's home, they had the option of sleeping on the front living room sofa, the love seat in the back room, or an air mattress. Scene photographs show the air mattress was inflated and leaning against a fireplace in the back room on November 19, 2017.

gun in her house. Ms. Powell testified that, to her knowledge, s no one in the family owned or even possessed a gun, and there were no guns in her residence prior to that morning.

While Detective Dewhirst was interviewing the Powell family, Detective Plaisance and Sergeant Pitchford located Mr. Hill at his residence in St. Charles Parish, as directed. Mr. Hill gave a statement, on the record, identifying himself in the screen shots of the Shell station video and acknowledging that he was present at 217 Meadows at the time the shots were fired. While at Mr. Hill's home, Detective Plaisance noticed the camouflage sweatshirt Mr. Hill was wearing in the Shell station photos, and Mr. Hill allowed the detective to seize that item. Detective Plaisance testified that he only seized the sweatshirt for identification purposes, and that, despite Technician Troxler's testimony that, while examining the clothing, he had noticed a fresh, dark stain on it, the sweatshirt was never sent to the lab for any testing. At trial, Mr. Hill testified that the stain on the hoodie may have been caused by some condiment, such as barbeque sauce, but that it was definitively not the victim's blood. Officers did not take Mr. Hill's shoes or pants, and they did not swab him for gunshot residue.

Detective Dewhirst testified that Mr. Hill was interviewed for a second time around 1:30 p.m. on the day of the murder, during which Mr. Hill reiterated that he was in the Shell video and was present at 217 Meadows Drive when the murder occurred. Mr. Hill also provided information that Elijah and Jayedon were with the victim and Defendant in the hours preceding the murder. Detective Dewhirst testified that Mr. Hill was "all over the place" during his statement, meaning that Detective Dewhirst was uncertain as to where Mr. Hill had been, and who he had been with, at various points in the night preceding the murder.[26] However, Detective

---

[26] Detective Dewhirst further testified he was unclear as to the real names of the individuals mentioned by Mr. Hill. According to Mr. Hill's testimony at trial, the night before the murder, Mr. Hill was driving the victim around to various drug sales. At some point, he recalled giving Defendant and Mr. Smith a ride.

Dewhirst knew that Mr. Hill stated that, after returning to 217 Meadows from the Shell station, he and the victim stayed outside smoking weed while waiting for a drug sale; he testified that Defendant and Mr. Smith went inside. Mr. Hill also told Detective Dewhirst that he was using the bathroom at 217 Meadows when he heard the shots and, immediately upon exiting the bathroom, found everyone inside. Mr. Hill further admitted to having fled the scene after shots were fired and to throwing the drugs out of his car window as he drove away. Before he was released, Mr. Hill provided detectives with a sample of his DNA. Detective Dewhirst testified that the information received from Mr. Hill on November 19, 2017 did not lead him to consider Mr. Hill a suspect.

After Defendant's interview ended at 10:45 a.m., officers held him at headquarters, where he remained shackled to the floor, until after 8:00 p.m., when Detective Dewhirst obtained a search warrant for "serological samples and DNA" from Defendant's person.[27] At Detective Dewhirst's direction, Technician Troxler obtained a sample of DNA from Defendant and collected Defendant's clothing and shoes.[28] Each item of clothing was placed in a separate bag and taken to the secure

---

Mr. Hill denied knowing either Defendant or Mr. Smith very well prior to November 19, 2017, but he discovered, sometime after his interviews with police on the day of the murder, that Mr. Smith is his cousin "somewhere down the line." Mr. Hill testified that, after leaving downtown New Orleans, the group "went by Slick['s]," which is what Mr. Hill called Elijah, whom he knew from school.

[27] Defense pointed out through the testimony of several officers that a warrant application to obtain Defendant's clothing and DNA made it seem as if Defendant matched the description of the suspect— black male wearing an orange skull cap walking away—that was called into dispatch immediately after officers arrived on scene. Detective Dewhirst testified that, although certain information contained in the probable cause affidavit used to obtain the search warrant for Defendant's clothing and DNA was not accurate, he was unaware of the inaccuracies at the time the application was submitted to the judge who issued the warrant. The affidavit improperly named Ms. Jones as the individual who reported an unknown black male with an orange skull cap walking away from the scene. Detective Dewhirst indicated that he only realized Ms. Jones did not provide information about the person in the orange skull cap when he later reviewed MVRs at trial, but he acknowledged that he did not make this clarification in the affidavit for Defendant's arrest submitted in May 2018. Nevertheless, Deputy Campuzano testified that, while on scene, he explained to Detective Dewhirst that Ms. Jones and the person who mentioned an orange skull cap were two separate people.

[28] Two cell phones were seized from Defendant when he was searched prior to being placed in Deputy Cosse's unit at the scene that morning.

processing room,[29] where it was placed in Technician Troxler's "locker."[30] Defendant was released from custody on the evening November 19, 2017, because Detective Dewhirst determined that there was insufficient evidence to charge him with a crime on that date.

Contemporaneous with the ongoing interviews, forensic testing was conducted on various pieces of evidence that had been recovered, namely: the three .45 caliber casings found near the victim's body, and a fired projectile, which was stuck to the victim's undershirt on his left shoulder.[31] On November 20, 2017, Jene Rauch, an expert in the fields of firearms and tool mark analysis, and bloodstain pattern analysis, conducted an analysis of the recovered firearm, the three casings, and the fired projectile. Ms. Rauch concluded that the three recovered casings, as well as the recovered projectile, were fired from the recovered pistol.

Also on November 20, 2017, Dr. Marianna Eserman, an expert in the field of forensic pathology, performed the victim's autopsy. She testified that the victim sustained three gunshot wounds in the head and neck area and that each entrance had a corresponding exit. Dr. Eserman identified soot and stippling around the wound located at the victim's right temple, indicating the gun's muzzle was, based on the tight soot pattern, as close as two (2) to three (3) inches, but no farther than six (6) inches, from the victim's temple. Based on patterns around the victim's neck

---

[29] Technician Troxler, Sergeant Tarullo, and Technician Marlowe all indicated that the evidence processing room was secure and had restricted access. Sergeant Tarullo's testimony verified that he received Exhibits 1 through 46 on the chain of custody form, and that the evidence remained in the evidence processing room. Firearms technician Rickie Marlowe, who was the St. Charles Parish evidence custodian in November 2017, testified that evidence in his custody was sometimes placed in the processing room, which is part of property and evidence. He also indicated that when an item of evidence is taken from a box designated on the chain of custody and is taken to the processing room, the evidence is still in the custody of the evidence custodian. According to technician Marlowe, this transfer would not be documented on the chain of custody.

[30] Technician Troxler testified that his locker did not lock. He testified that Sergeant Tarullo took possession of the evidence at 1:00 p.m. on November 20, 2017, and the evidence remained in the processing room. He further admitted to providing inaccurate testimony at a pre-trial hearing during which he testified that the evidence went to the evidence custodian and evidence room.

[31] At the scene, a $20 bill and the victim's driver's license were discovered in his pocket, but during the autopsy, as Technician Troxler testified, two $20 bills, two quarters and a clear baggy containing green vegetable matter were recovered. The victim's cell phone was not recovered. Detective Dewhirst testified the victim's phone records were requested, but the phone company did not respond to the subpoena. He testified that he did not ask the phone company to ping the victim's phone.

wounds, Dr. Eserman indicated that the muzzle of the gun was likely less than two (2) feet from the victim when those shots were fired. Dr. Eserman concluded her testimony by identifying the cause of death as gunshot wounds to the head and the manner of death as a homicide.

In the days following the murder, Detective Dewhirst re-contacted both 9-1-1 callers, but indicated that neither follow-up conversation was significantly helpful. After speaking with Ms. Jones and Ms. Payne, Detective Dewhirst sought information from various other individuals who lived near the scene of the murder.

Roderick Williams and Anthony Reynaud[32] both lived on Meadows Drive and maintained some form of surveillance, which they submitted to Detective Dewhirst.[33] Unlike Mr. Reynaud's surveillance system that records all-day, every-day, Mr. Williams' home surveillance system only records footage when he is actively watching the feed through an application on his mobile device.

On the day of the murder, Mr. Williams, who lived at 219 Meadows Drive, took a screenshot from his surveillance system. The screenshot showed two cars and a person standing in the driveway of 217 Meadows.[34] Mr. Williams testified that he heard shots, looked out the window, and saw someone talking on the phone.[35] He also testified that he saw a lady across the street, who was screaming, and saw Defendant looking at the body on the ground.[36] Mr. Williams estimated that one to two (1-2) minutes passed between hearing the shots and taking the screenshot of his

---

[32] The transcript contains two spellings of the witness' last name: "Reynaud" and "Reynard." This Court maintains the "Reynaud" spelling and, additionally, points out that this witness, Anthony Reynaud, is not to be confused with another individual named "Reynaud" or "Reynard," who is mentioned by Mr. Smith in his testimony.

[33] Mr. Reynaud gave detectives access to the camera footage, but was not present while the officers were reviewing and recording from the system.

[34] When shown the screenshot from Mr. Williams' surveillance video, Mr. Hill identified his car and agreed that *someone* was standing behind his car. He testified that he could not identify the person and testified that he did not remember the depicted event taking place.

[35] At first, Mr. Williams said he did not know who it was, but when asked to identify the screenshot at trial, he indicated that the person pictured standing next to the vehicles was "[Defendant] Jakorey."

[36] Mr. Williams' testimony that he saw Defendant looking at the body conflicts with his later testimony that he could not see the body when he looked out the window. Also, while he testified that he saw the lady screaming when he looked out his window, he could not be sure if the car pictured in the screenshot was still in the driveway at the same time the lady was screaming in the street.

surveillance video. He did not see anyone get into a vehicle, and he did not see a vehicle leave the driveway. Mr. Williams did not see Defendant with a gun, and he did not see Defendant go inside after he took the screenshot.

Mr. Reynaud testified at trial that he had no firsthand knowledge of the events of November 19, 2017. Nevertheless, he testified that he has at least two cameras on his property directed at Meadows Drive, which record "constantly."[37] He testified that the minute timestamp provided by his recording system is accurate, but that he had not done anything to adjust the system for daylight savings. At trial, Detective Dewhirst reviewed approximately fifteen (15) seconds of video that he had recorded from Mr. Reynaud's system. He testified that he was able to see Mr. Hill's silver car pass by Mr. Reynaud's house, as well as another vehicle passing by approximately five minutes before Mr. Hill's vehicle.[38]

Continuing to search for information, in the days following the murder, Detective Dewhirst handed out Crime Stoppers flyers along Meadows Drive, during which time he made contact with Janae Smothers. Ms. Smothers did not provide information to the sheriff's office on the day of the shooting.[39] Detective Dewhirst testified that, in her recorded statement, Ms. Smothers stated that, after hearing shots on November 19, 2017, she saw Defendant and Elijah running into 217 Meadows Drive.[40] Likewise, at trial, Ms. Smothers testified that shortly thereafter she saw Defendant exit the house by himself, squat over the body "right there by the blood," and walk around it.[41] She then testified that "Mr. Hill just appeared out of nowhere"

---

[37] Mr. Williams testified that his system retains data for thirty (30) days.
[38] Mr. Hill also identified his vehicle in the video at trial.
[39] At trial, Ms. Smothers testified that on the day of the murder she was worried if she was seen talking to the police that it may impact her and her family's safety. According to her testimony, Ms. Smothers called Crime Stoppers after an officer gave her a flyer that contained the phone number for Crime Stoppers. Although Ms. Smothers first denied that she and Detective Dewhirst discussed Crime Stoppers during her recorded statement, on cross-examination, Ms. Smothers agreed that they discussed Crime Stoppers. Ms. Smothers denied lying to police to collect a $5,000 reward; she testified that she did not hear back from Crime Stoppers and did not receive a payment for the information she provided.
[40] Upon receiving Ms. Smothers' statement, Detective Dewhirst attempted to locate Elijah, but was unsuccessful.
[41] Defense counsel questioned Ms. Smothers as to potential inconsistencies between her testimony and her recorded statement. Ms. Smothers told officers that she walked (not ran) to her front door, that she didn't

from the right side of the apartment, held a short conversation with Defendant, and then entered the car next to the victim's body and drove away.[42]

On or about November 28, 2017, Mr. Hill provided a third statement to detectives. Detective Dewhirst confirmed that, at first, Mr. Hill stated that he thought everyone was inside at the time of the shots; however, he later stated that Defendant and Elijah were outside at the time of the shots, but, of that, he was not absolutely certain; and then, subsequently, Mr. Hill stated that Defendant and Elijah ran inside after the shots. In the final version of his statement, Mr. Hill indicated that he did not know where Mr. Smith was at the time of the shots. According to Detective Dewhirst's testimony, Mr. Hill's third statement also included information that Defendant and Mr. Smith were riding in a vehicle with two individuals, who had not been mentioned by any other witness, on the night leading up to the murder. Detective Dewhirst testified that he was unable to find one of the named individuals and that the other said he was not involved and provided no further information.

Detective Dewhirst testified that, during his third statement, Mr. Hill expressed that he was afraid the victim's "people" were going to kill him because they thought he set up the murder. Detective Dewhirst also acknowledged that someone mentioned Crime Stoppers to Mr. Hill during his third statement; specifically, Mr. Hill was told that a person with information could receive a reward for providing an anonymous tip to Crime Stoppers.

At trial, Mr. Hill testified that, after returning to 217 Meadows from the Shell station, where he had purchased a Red Bull, Mr. Hill took a nap in his car,[43] so he

---

hurry to get outside, but then later testified that she was the first person outside, even before Ms. Jones. Further, Ms. Smother acknowledged that, although she had previously told officers that Defendant and Elijah ran "straight up" the path to the door, Mr. Hill's car would have been in their way. Defense counsel additionally questioned Ms. Smothers regarding her description of Defendant's clothes as compared to the clothing seized from Defendant where Ms. Smothers testified that she had informed Detective Dewhirst that Defendant was wearing "khakis," a sweatshirt, and a tan or white thermal undershirt while the clothing seized from Defendant included jean pants, a jacket, and a blue shirt.

[42] She testified that defendant said, "[Y]ou see this?" to which Mr. Hill just looked at the body, got in the car, and drove off. It is not clear whether the conversation between Defendant and Mr. Hill took place before or after Ms. Smothers saw Defendant enter and then exit 217 Meadows.

[43] Mr. Hill did not mention taking a nap in any of his prior statements.

18

could not testify to where any other individual was during that time. When he woke up from his nap, he entered the house to go to the restroom, and exited immediately after hearing the shots. Mr. Hill thought he remembered seeing Jayedon on the couch in the back room when he exited the restroom and testified that, as he approached the front door, "I think Elijah came in first and [Defendant] ran in after him."

On November 30, 2017, Detective Dewhirst conducted a follow-up interview with Jayedon. Ms. Powell testified that Detective Dewhirst began that interview by informing Jayedon that his DNA had been found on the gun and that he needed to clear his name. She further testified that she believed that detectives told Jayedon they suspected Defendant of the shooting.[44]

Detective Dewhirst acknowledged that, when asked about the gun, Jayedon repeated three times that he had merely picked up the gun and put it back down; however, Jayedon's story began to change with repeated questioning. During trial, it was established that detectives never described the gun to Jayedon. Detective Dewhirst testified that he did not know whether the gun Jayedon admitted to handling was the same gun found in the couch; however, only one gun was found at 217 Meadows upon the execution of the search warrant.

Jayedon testified that when he gave the second statement, he was afraid of being charged with murder.[45] He acknowledged admitting to detectives, three times, that, on the morning of the murder, he saw a gun on the kitchen counter, picked it up around 5:00 a.m., fiddled with it, and quickly put it back down. Jayedon testified that the detectives kept pushing him for more information, such that he eventually told them that Mr. Smith handled the gun and put bullets in it, before also putting it

[44] At trial, Detective Dewhirst acknowledged telling Ms. Powell, "I'm thinking [Defendant] put the gun under the couch with Jayedon sleeping on it. So, if that's the case and he doesn't tell us, he will be arrested for accessory after the fact to murder." This portion of Ms. Powell's recorded statement was read by defense counsel during trial.

[45] Jayedon testified that Detective Dewhirst told him he could get four years, but that statement by Detective Dewhirst was not reflected in the transcript of Jayedon's recorded statement.

19

back down. He testified that, upon revealing that information, Detective Dewhirst told him that he was not telling the truth, continued to question Jayedon, and also told him that he had an arrest warrant for Defendant. Jayedon then acknowledged that he subsequently told detectives, "[Mr. Smith] put two bullets back in and then put the --- gave [Defendant] the clip and weapon. Then, boom. I don't know what happened after that."

At trial, Jayedon first testified that when he saw the gun, he picked it up and put it down, but he did not remember Mr. Smith or Defendant handling the gun. After reviewing his November 30, 2017 statement, Jayedon testified that Mr. Smith played with the bullets and put two bullets in the clip. Jayedon indicated that he did not see what happened to the gun next and that he did not see Mr. Smith give the gun to anyone. After reviewing his statement, however, he testified that he told the police that Mr. Smith gave the gun to Defendant. On cross-examination, Jayedon indicated that Mr. Smith took the gun from him and "put it back down somewhere." Jayedon stated that he did not know what happened with the gun afterwards. When the State questioned Jayedon again about the seemingly inconsistent nature of his testimony, he testified that he provided accurate answers on direct examination, except when he testified to seeing someone pass the gun to Defendant.

Detective Dewhirst testified that, when confronted with Mr. Hill's story, namely that Mr. Hill was in the bathroom at the time the shots were fired, Jayedon disputed that information. Jayedon stated that he was positive Mr. Hill was not in the house at the time of the shots because he was the only person downstairs, and he never saw anyone enter or exit the front door. Jayedon also stated that if someone had walked inside to get a beer, that person would have had to walk right past him.

Jayedon further testified that everyone in the house that night went outside sometime around 6:00 a.m. or 7:00 a.m.[46] and that there had been conversation about

---

[46] He testified that it was daylight.

going to the store. Jayedon could not say whether anyone ever actually went to the store as he went back inside to sleep. Nevertheless, Jayedon also testified that, after the discussion of the store and after he had gone to sleep and then later awakened, he saw Elijah and Defendant again. However, Jayedon also indicated that prior to officers knocking on the door, and approximately fifteen to twenty (15-20) minutes *after* shots were fired, Elijah woke him up to ask a question.[47] Jayedon testified that he did not see or feel anyone put anything under the sofa cushions while he was asleep. According to his testimony, Jayedon did not place the gun under the cushion, and he was unaware of who had done so. Jayedon stated that he did not know whether someone had entered through the back door and hid the gun in the sofa while he was standing at the front door, but that he probably would have noticed because he did not stay at the front door for very long.

Also on November 30, 2017, Detective Dewhirst and Technician Troxler examined various items of evidence, including the clothing and shoes that previously had been seized from Defendant. Technician Troxler testified at trial that, while examining the clothing, he and Detective Dewhirst noticed and photographed a red substance on the outer edge of Defendant's right shoe.[48] Technician Troxler testified that he neither saw nor photographed anything else on Defendant's clothes. When questioned about whether he would have photographed Defendant's jeans, had he seen any spots on them, Technician Troxler responded, "Absolutely." Detective Dewhirst agreed that he did not see any blood on Defendant's jeans on November 30, 2017. He further agreed with defense counsel that, because no photographs were taken of Defendant's clothing or shoes prior to November 30, 2017, neither the

---

[47] Jayedon also indicated that he went back inside after the group talked about going to the store and went to sleep until Elijah woke him to ask a question. Thus, there appears to be some conflicting testimony as to whether Elijah woke Jayedon before or after shots were fired.

[48] Technician Troxler testified that the red-stain on the front of Mr. Hill's camouflaged sweatshirt was photographed on the same day.

21

defense nor the jury could see for themselves whether, on the day of the murder, there had been blood on Defendant's clothing.

Detective Dewhirst testified that officers were unable to locate Mr. Smith on the day of the murder such that they issued a be-on-the-look-out (BOLO) for him. Mr. Smith was located at a correctional facility in Atlanta, Georgia, where Detective Dewhirst and Sergeant Pitchford took his recorded statement on December 5, 2017. Detective Dewhirst stated that, because Mr. Smith was not located until a great deal after November 19, 2017, officers were unable to obtain the clothing he wore on the day of the shooting. Nevertheless, Mr. Smith provided a DNA sample. To this point, Detective Dewhirst testified that the mere presence of Mr. Smith's DNA on the gun did not warrant a second interview with Mr. Smith.[49]

According to Detective Dewhirst, during the interview, Mr. Smith confirmed he was with both the victim and Defendant on the preceding night, as well as the morning of, the murder. Detective Dewhirst testified that Mr. Smith stated he had been walking away from 217 Meadows at the time of the murder; Mr. Smith did not indicate whether or not he saw anyone commit the shooting. Mr. Smith also led Detective Dewhirst to believe Elijah was outside at the time of the shooting. After the shots were fired, Mr. Smith continued walking away from 217 Meadows and got a ride to St. Rose. At trial, Mr. Smith was confronted with his prior recorded statement where at first he claimed, "The crazy part about it, man, my little cousin gave me a ride," but then changed his statement to say that "Reynard" brought him to St. Rose. Detective Dewhirst testified that he did not contact "Reynard Straughter" or view surveillance video to confirm Mr. Smith's version of events.[50]

After forensic testing matched the gun recovered from 217 Meadows to the casings found at the scene, Sarah Serou, M.S., the forensic DNA analyst and CODIS

---

[49] Detective Dewhirst reasoned that officers already received information as to why Mr. Smith's DNA was possibly on the gun such that a follow-up interview was unnecessary.

[50] Detective Dewhirst also testified that he believed Mr. Hill gave Mr. Smith a ride.

Administrator at the Jefferson Parish Sheriff's Office DNA lab, determined that the DNA mixture found on the grip and trigger of the gun was consistent with a mixture from two major contributors and at least two minor contributors.[51] Defendant and Mr. Smith could not be excluded as major contributors to the DNA in the mixture.[52] According to Ms. Serou's report, the DNA profile obtained from the major contributors to the swab of the pistol was greater than 100 billion times more likely to be a mixture of DNA from Defendant and Mr. Smith than a mixture of DNA from two unknown, unrelated individuals. Ms. Serou testified that, while secondary DNA transfer is possible, it is unlikely to result in a high enough amount to be considered a major contributor. Ms. Serou further testified that she could not state who of the various DNA contributors shot the gun.

On approximately December 4, 2017, Ms. Serou conducted an analysis of Defendant's shoes, which officers seized the day of the murder. Ms. Serou found two spots on the Defendant's right shoe that tested positive for blood; however, she testified that only one spot contained enough DNA to make a valid profile and that profile was consistent with the DNA profile of the victim.

Although police obtained an arrest warrant for Defendant as early as November 27, 2017, Detective Dewhirst was unable to locate Defendant in Louisiana. Defendant was eventually located in Tennessee, and, on January 31, 2018, a second interview was conducted regarding the murder.[53] Detective Dewhirst testified that Defendant was informed that he could not be excluded as a major contributor to the DNA found on the gun, but Defendant did not indicate that he had

---

[51] According to Ms. Serou's report dated March 26, 2019, the dates of analysis were November 20, 2017 through February 27, 2018; September 13, 2018 through October 5, 2018; and March 14, 2019 through March 26, 2019. The March 26, 2019 report superseded her previous report issued on October 5, 2018. In analyzing the DNA on murder weapon, Ms. Serou tested blood samples provided by Mr. Hill, Mr. Smith, Defendant, the victim, Ms. Powell, Kyla, Jayedon, Elijah, as well as the original owner of the gun, Corlis Poole.

[52] Ms. Serou was unable to identify the two minor contributors, but testified that neither Jayedon nor Elijah could be excluded.

[53] Detective Dewhirst did not know when Defendant went to Tennessee and did not know if Defendant was aware officers were looking for him.

ever touched, or even seen, the gun. According to Detective Dewhirst's testimony, Defendant further confirmed that he was in the screenshot taken by Mr. Williams' surveillance system and explained that the blood on his shoe was likely because he went near the body with the "lady from across the street."

Nevertheless, Chief Timothy Scanlan, commander of Jefferson Parish Sheriff's Office Technical Services Bureau, who was accepted as an expert in the fields of crime scene reconstruction and bloodstain pattern analysis, testified that the round blood stain on Defendant's right shoe appeared to be a spatter stain while the other, secondary stain, appeared to have been smeared or transferred. Chief Scanlan further testified that the shoe stains were consistent with either the shoe being in close proximity to the victim as he was shot or with the shoe coming into contact with the victim's blood after a bloodletting injury.

Further, after analyzing Defendant's shoes, Chief Scanlan requested to see Defendant's other clothing.[54] He identified four stains, which were consistent with "spatter" from a gunshot wound, approximately six (6) to ten (10) inches from the bottom of the right pant leg.[55] Chief Scanlan testified that studies show that blood spatter associated with a gunshot wound does not go farther than two (2) to four (4) feet away from the blood bearing injury. He additionally testified that the spatter on the bottom portion of the jeans was "more consistent with that bloodletting injury happening at ground level, with the jeans being close to the victim when that bloodletting injury happened" and that there was no way a person could have been

---

[54] Chief Scanlan testified that, to the best of his knowledge, prior to his request that the jeans be sent to the lab in December of 2018, Defendant's jeans had not been tested.

[55] On March 14, 2019, Ms. Serou received Defendant's jeans and observed four spots on the front right pant leg. Ms. Serou was able to obtain full DNA profiles from two of the spots, and she determined that the DNA profiles were consistent with the DNA profile of the victim. She testified that the probability of finding the same DNA profile, if the DNA had come from a randomly selected individual other than the victim, was one in greater than 100 billion.

inside the apartment at the time of the shooting and had the bloodstain patterns found on Defendant's jeans.[56]

Ultimately, as previously mentioned, at the conclusion of trial, on April 24, 2019, a twelve-person jury returned a unanimous verdict of guilty as charged.

## ASSIGNMENTS OF ERROR

On appeal, Defendant, through counsel, has alleged the following assignments of error:

1. The trial court erred in denying the defense's motion for post-verdict judgment of acquittal because the State failed to prove the identity of the shooter beyond a reasonable doubt.

2. The trial court erred in denying the defense's motion to suppress evidence.

3. The Defendant was denied his right to present a defense when the trial court did not allow relevant witnesses to testify in support of the defense's motion to suppress the evidence.

Additionally, Defendant filed a pro se brief with this Court assigning the following errors:

1. Defendant's Sixth and Fourteenth Amendment rights were violated when the jurors were permitted to return a finding of guilty by a non-unanimous verdict in violation of the United States Supreme Court holding in *Ramos v. Louisiana*.

2. Defendant's rights to a fair and impartial trial under the Sixth Amendment to the United States Constitution were violated when the

---

[56] Chief Scanlan testified that the bloodstains on the bottom portion of Defendant's jeans were inconsistent with a cough, a sneeze, a nosebleed, a cut on a hand, or the act of flicking or flinging blood. He also testified that the likelihood of windblown blood was "highly improbable." He indicated that he saw no evidence of windblown blood, such as scalloped edges or "satellite spatters" broken off the pool of blood on the ground.

State sought "trial by ambush" by the introduction of expert opinion evidence.

3. Defendant's rights to a fair and impartial trial under the Sixth Amendment to the United States Constitution were equal to that of his right to present a defense and the trial court granting the State's motion *in limine* violated Defendant's rights.

## DISCUSSION

When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); *State v. Mayeux*, 94-105 (La. App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the Defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the Defendant's conviction, it must then determine whether the trial court erred and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. *State v. Alexis*, 98-1145 (La. App. 5 Cir. 6/1/99), 738 So.2d 57, 64, *writ denied*, 99-1937 (La. 10/13/00), 770 So.2d 339. Therefore, Defendant's assigned error concerning the sufficiency of the evidence will be addressed first.

**Sufficiency of Evidence:**
(*Counseled Assignment 1*)

In his first counseled assignment of error, Defendant asserts that the trial court erred in denying his post-verdict judgment of acquittal on June 17, 2019, in which Defendant argued that the evidence did not permit a finding of guilt beyond a reasonable doubt. The question of sufficiency of the evidence is properly raised by

a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Ellis*, 18-463 (La. App. 5 Cir. 7/15/19), 276 So.3d 633, 642.

Defendant argues that the state failed to meet its burden of proving the identity of the shooter beyond a reasonable doubt and that the State did not present evidence sufficient to establish that Defendant was a principal to the murder.

Defendant contends that the only evidence linking him to the shooting was the fact that he could not be excluded as a contributor to the DNA on the gun and the presence of two small dots of the victim's blood on his pants leg and shoe.[57] He questions the testimony of Chief Scanlan regarding bloodstain pattern analysis, suggesting that two dots do not make a "pattern," but agrees with Chief Scanlan's testimony that the blood droplets do not prove the identity of the shooter.

Defendant argues that the police conducted "an incomplete and haphazard investigation" that was "tailored" to finding that Defendant was the shooter. In support of this argument, Defendant suggests that the other men with the victim prior to the shooting were all equally likely to have been the shooter. He specifically suggests that the jury could not have reasonably excluded the possibility that Elijah Powell was the shooter. The lack of evidence pointing to another individual, Defendant suggests, was caused by the police's failure to collect and test the clothing of the individuals present on the day of the murder and swab Defendant and others for gunshot residue. Defendant makes the argument that the shooter would likely have blood on his sleeves if he had shot the victim at close range.

Further, Defendant contends that it is possible that someone was seeking retribution against the victim after being sold "fake drugs" or that the person involved in the drug sale the victim was waiting on that morning could have been the shooter. Defendant highlights the fact that the police did not focus more attention

---

[57] In making this argument, Defendant necessarily assumes that the other spots on the pants that were not tested did not contain the victim's blood.

on the report that a man in an orange skull cap was seen walking away after the shots were heard.

The standard of review for sufficiency of the evidence challenges is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. It is not the function of the appellate court to assess credibility or reweigh the evidence; rather, a reviewing court must consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372 (citing *State v. Williams*, 98-1146 (La. App. 5 Cir. 6/1/99), 738 So.2d 640, 648, *writ denied*, 99-1984 (La. 1/7/00), 752 So.2d 176; *State v. Juluke*, 98-341 (La. 1/8/99), 725 So.2d 1291).

In this case, Defendant was convicted of the second-degree murder of Anthony Fletcher. He does not contest that the State failed to prove the statutory elements of the offense for which he was convicted,[58] but rather argues that the

---

[58] The definition of second-degree murder, as provided to the jury in this case, is the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1; *see State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277.

Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1).

Because it is a state of mind, specific intent may be inferred from the circumstances and the defendant's actions. *State v. Mickelson*, 12-2539 (La. 9/3/14), 149 So.3d 178, 182. Specific intent can be inferred from the intentional use of a deadly weapon, such as a knife or a gun, from the circumstances and the defendant's actions, and the extent and severity of the victim's injuries. *State v. Patterson*, 10-415 (La. App. 5 Cir 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La 6/17/11), 63 So.3d 140.

The State presented evidence that the victim was shot three times in the head and neck area and that these gunshot wounds were the cause of his death. The presence of soot and stippling on the wound close to the victim's right temple indicated the gun muzzle was less than six (6) inches from the victim's skin. The stippling on the victim's neck wounds indicated that the victim may have been two (2) feet or less from the muzzle of the gun when fired. Based on the use of a deadly weapon, the number of gunshots to the victim's head and neck area, and the testimony regarding the proximity of the firearm to

28

evidence was insufficient to prove his identity as either the shooter or a principal to the murder.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. *State v. Ray,* 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied,* 13-1115 (La.10/25/13), 124 So.3d 1096. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500, *writ denied,* 2015-0685 (La. 2/26/16), 187 So.3d 468.

The State relied on circumstantial evidence to establish Defendant's identity as the shooter. Circumstantial evidence is proof of collateral facts and circumstances from which the existence of the main fact can be inferred using reason and common experience. *Thompson*, 259 So.3d at 1265 (citing *State v. Shapiro*, 431 So.2d 372, 378 (La. 1982)). The rule regarding circumstantial evidence, according to La. R.S. 15:438, is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id.* (citing *State v. Smith*, 106 So.3d at 1053). This is not a separate test from the *Jackson* standard; all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant it guilty beyond a reasonable doubt. *Nelson*, 169 so.3d at 501.

The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by a defendant offers an exculpatory explanation of events. *Thompson*, 18-273, 259 So.3d at 1266 (citing *State v. Mitchell*, 09-996 (La. App. 5 Cir. 5/25/10), 40 So.3d 1122, 1127, *writ denied*, 10-1557 (La. 10/21/11), 73 So.3d 370). Rather, the reviewing court must determine whether the possible

---

the victim at the time the shots were fired, the jury could reasonably conclude that a homicide occurred and that specific intent to kill or cause great bodily harm was established.

alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. *Id*; s*ee also State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, 83.

The weight given to a witness' testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Thompson*, 18-273, 259 So.3d at 1266 (citing *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833); *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, *writs denied*, 03-2745 (La. 2/13/04), 867 So.2d 688 and 08-1951 (La. 1/30/09), 999 So.2d 750. While, evidence impeaching a witness may assist the trier of fact in determining the credibility or believability of the witness, the fact that a witness may have been impeached by prior inconsistent statements does not prohibit the trier of fact from believing anything said by the witness. Inconsistencies in a witness' statements are only one of the factors the trier of fact weighs in determining whether or not to believe a witness' trial testimony. *State v. Brown*, 01-41 (La. App. 5 Cir. 5/30/01), 788 So.2d 694, 701.

Based on a review of the evidence presented at trial, we find the jury could have reasonably concluded that Defendant was guilty of second-degree murder beyond a reasonable doubt.

Witness testimony tends to establish that Defendant was present on the sidewalk with the victim as the shots were fired. Ms. Smothers testified that, after the shots were fired, but before anybody else ventured out of their houses that morning, she was watching through her window. She saw the body on the ground and Defendant and Elijah running and "falling all on top of each other trying to get back in the house." Mr. Hill's testimony at trial corroborates Ms. Smothers' testimony in that Mr. Hill indicated that he heard gunshots while he was in the bathroom inside 217 Meadows and, upon exiting the bathroom, he saw Defendant and Elijah run in through the front door.

30

Mr. Hill then testified that he exited the house through the front door, got in his car, and drove away. Ms. Smothers also testified to seeing Mr. Hill leave. However, in her version of the story, Mr. Hill appeared from somewhere on the side of the house and approached his vehicle. At that time, Defendant had exited 217 Meadows and motioned to the body asking Mr. Hill, "you see this?" Thereafter, Ms. Smothers testified that Mr. Hill got in his car and drove away.

Defense counsel questioned Ms. Smothers at trial regarding the time line of her testimony and various inconsistencies in her statements about whether Mr. Hill's car in the driveway would have been blocking Elijah's and Defendant's path to the door. Mr. Hill was also questioned about the inconsistent statements he gave to police regarding whether Defendant was inside 217 Meadows when Mr. Hill exited the bathroom or whether Defendant entered the apartment at some point afterwards.

Although both Ms. Jones and Ms. Payne testified that they saw Defendant exiting 217 Meadows as they were coming outside and calling 9-1-1—seemingly corroborating Defendant's assertion that he was inside at the time the shots were fired—one piece of photographic evidence supports Mr. Hill's and Ms. Smothers' accounts. Mr. Anthony Reynaud testified that he took a screenshot of what he saw on his security camera after hearing the shots. Both the State and the defense seemed to accept that the lower portion of the victim's body was visible in the screenshot on the other side of Mr. Hill's vehicle as it sat in the driveway of 217 Meadows. Mr. Reynaud identified Defendant as the person pictured standing beside Mr. Hill's vehicle, seemingly talking on the phone. Both Ms. Payne and Ms. Jones denied seeing any cars in the driveway next to the body and denied seeing anyone drive away as they were coming outside. Therefore, the jury may reasonably have chosen to believe that Defendant was outside during and shortly after the shots were fired, but before Mr. Hill left and neighbors started investigating the commotion.

31

Further, although Defendant informed officers on scene that he was inside at the time of the murder, forensic evidence places Defendant outside at the time the shots were fired. DNA and blood spatter analysis confirmed the presence of the victim's blood on the right leg of Defendant's jeans and on Defendant's right shoe. Chief Scanlan testified that the size, shape, distribution, and density of the drops of blood on Defendant's pant leg were consistent with "spatter" from a gunshot wound. Chief Scanlan further testified that the pattern was consistent with the person wearing the pants being within two (2) to four (4) feet of the victim as he was being shot.

Expert testimony also refuted the defense's suggested explanations for how the blood came to be on Defendant's clothing. Chief Scanlan testified that neither a nose-bleed, a spurt from a needle injection, or flicking blood from the hand adequately explained the equally distributed, round, millimeter-or-less in diameter spots of blood. Chief Scanlan and Ms. Serou both indicated that the blood droplets did not appear to be diluted as they would be if produced from a nose bleed or cough. As for Defendant's suggestion that he could have gotten blood on him when he got close to the body after the murder, Chief Scanlan testified that he had never seen blood blow off hair nor did he see any evidence of windblown blood on crime scene photographs. Technician Troxler, who took the crime scene photographs, also testified that he did not observe smears or footprints in the blood around the victim's head or at the end of the driveway, nor did he observe blood blowing in the wind. Detective Dewhirst testified that the blood spots were on the rim of Defendant's shoe, not on the sole.

Chief Scanlan's testimony placed Defendant within two (2) to four (4) feet of the victim when he was shot, and Dr. Eserman estimated, based on the soot and stippling patterns surrounding the victim's gunshot wounds, that the gun was less

than six (6) inches from the victim's temple when fired and less than two (2) feet from the victim's neck.

Additionally, while none of the witnesses testified to seeing Defendant with a gun after the shots were fired, Jayedon's testimony placed a gun in Defendant's hands several hours prior to the murder. Although Jayedon stated that he had lied in his prior statements when he stated that Mr. Smith handed the gun to Defendant, he admitted when questioned by the State that he did not want to see Defendant convicted of murder, stating, "I know for a fact [Defendant] is not capable of killing nobody."

The parts of Jayedon's testimony that remained consistent were corroborated by physical evidence. Jayedon maintained that he had handled a gun in the house the night before the murder, and DNA evidence corroborated Jayedon's statement; Jayedon could not be excluded as a minor contributor to the DNA mixture found on the weapon. DNA evidence also corroborated Jayedon's statements to detectives that Defendant had handled the gun. Ms. Serou testified that Defendant could not be excluded as a major contributor to the DNA mixture found on the gun. Although Ms. Serou conceded that secondary DNA transfer is possible, she also indicated that secondary transfer is not likely to produce high enough amounts of DNA to be considered a major contributor.

The .45 caliber handgun found underneath the sofa cushions where Jayedon testified he had been sleeping when he heard the shots was determined to be the murder weapon. Firearms testing and analysis confirmed that the three .45 caliber casings and the projectile recovered from the scene were fired from the gun recovered in the search of 217 Meadows.

Although Jayedon testified that he went back to sleep on the couch and did not see, hear, or feel anyone stash the gun under the couch cushions after the shots, the gun necessarily had to be placed there after the murder but before the police

searched the residence. It is clear from MVR footage that Defendant entered that residence after deputies responded to the scene. MVR footage also captured Defendant expressing concern when he believed officers were allowed into the residence.

Finally, given that forensic evidence placed Defendant within two (2) to four (4) feet of the victim as he was shot, the jury could find that Defendant made purposeful misrepresentations to officers regarding his whereabouts at the time of the murder. Defendant repeatedly told officers on the scene that he was inside 217 Meadows when he heard the shots, but at trial, Chief Scanlan testified that there was no way the victim's blood could have gotten on Defendant's clothing in the observed spatter pattern if Defendant had been inside at the time of the murder. A finding of purposeful misrepresentation of facts by a defendant following an offense reasonably raises the inference of a "guilty mind," just as is the case of "flight" following an offense. *Mitchell*, 99-3342, 772 So.2d at 85 (quoting *State v. Captville*, 448 So.2d 676, 680 n.4 (La. 1984)); *State v. Wiley*, 03-884 (La. App. 5 Cir. 4/27/04), 880 So.2d 854, 870, *writ denied*, 04-1298 (La.10/29/04), 885 So.2d 585.[59]

As to Defendant's contention that any of the other individuals who had been with the victim up to the time of the murder were all equally likely to be the shooter, the jury heard testimony from those individuals, and the defense had ample opportunity to examine each, regarding their location and the location of others before, during, and after shots were fired.

Mr. Smith admitted that he was outside 217 Meadows—walking down the street approximately five houses away—when the shots were fired, and he could not be excluded as a major contributor to the DNA mixture on the murder weapon. Mr.

---

[59] The State also brought special attention to the fact that Defendant left the immediate crime scene area after being told that detectives wanted to speak to him and the fact that, when detectives issued a warrant for Defendant's arrest several weeks after the murder, he was not found in the State of Louisiana. Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Darby*, 17-261 (La. App. 5 Cir. 11/15/17), 232 So.3d 1261, 1269.

Smith's explanation as to how he got to St. Rose that day was somewhat suspect in that he first stated that his little cousin gave him a ride but then claimed he thought it was his friend Reynard. Furthermore, because police were unable to locate Mr. Smith for weeks after the murder, his clothing could not be recovered for examination and testing and a gunshot residue test would not have yielded evidence.

However, the murder weapon was discovered inside the residence at 217 Meadows, and although Mr. Hill initially informed detectives that he saw Mr. Smith inside 217 Meadows Drive after shots were fired, he later indicated that he remembered Mr. Smith was not inside the residence. While Mr. Hill's testimony that Mr. Smith was not seen entering the house after the shots may be considered suspect, since Detective Dewhirst believed it was probably Mr. Hill who gave Mr. Smith a ride to St. Rose after fleeing the scene of the murder, Jayedon also denied seeing Mr. Smith inside the house after the shots woke him up, and his testimony did not reveal any motives for protecting Mr. Smith. Also, Ms. Smothers testified to seeing Defendant and Elijah running inside after hearing the shots; she testified that she did not see Mr. Smith.

Mr. Hill gave multiple inconsistent statements over the course of the investigation. He admitted to fleeing the scene after the murder, and his sweatshirt had a fresh, dark stain on it the day of the murder that was never tested for the presence of blood. During one of Mr. Hill's statements, he indicated that he and the victim were alone outside, waiting on the victim's last drug sale, when Mr. Hill went to use the bathroom, heard the shots, and exited the bathroom to see everyone including Defendant inside 217 Meadows. However, while no witness confirmed Mr. Hill's testimony that he was inside the house at the time the shots were fired, and Jayedon specifically refuted his testimony at trial, no witness placed Mr. Hill in front of 217 Meadows at the time of the shooting. Most notably, Mr. Hill was excluded as a contributor to the DNA mixture found on the murder weapon.

Jayedon could not be excluded as a minor contributor to the DNA mixture on the murder weapon; he consistently stated that he was asleep on the "back sofa," where the murder weapon was located but did not see, hear, or feel anyone put it there; and the police never examined or tested the clothing or shoes Jayedon was wearing on the morning of the murder or tested him for gunshot residue. However, Jayedon admitted that he handled the gun before placing it down on the kitchen counter in the hours leading up to the murder. Further, no witness placed Jayedon outside 217 Meadows when the shots were fired, and in fact, Mr. Hill testified that he believed he saw Jayedon on the sofa in the back room following the sound of gunshots.

The only testimony at trial that Elijah was inside 217 Meadows at the time the shots were fired was his own testimony that he arrived at the house sometime after midnight, immediately fell asleep on the air mattress in the back room, and did not awaken until he heard a woman screaming after the murder. Even Jayedon testified that he did not see Elijah in the house and did not know where Elijah was at the time of the murder. However, Defendant's original statements on the scene indicated that he and the victim were alone before Defendant entered the house to get a beer, and Mr. Hill originally told police that he saw Elijah inside the house upon exiting the bathroom. So, by the time officers received information that Elijah was seen running inside 217 Meadows after the shots were fired, it was too late to collect his clothing for examination and testing or swab for gunshot residue. Nevertheless, although the trial testimony of both Mr. Hill and Ms. Smothers places Elijah running inside 217 Meadows after the murder, and while Elijah could not be excluded as a minor contributor to the DNA mixture found on the murder weapon, neither could the expert determine conclusively that Elijah's DNA was on the gun. Distinct from Jayedon's case, there was no other testimony that Elijah was seen handling the gun.

Finally, at trial, Defendant contended that the shooter could have been either an unknown person who sought retribution from the victim after being sold fake drugs or the unknown individual the victim was waiting to sell drugs to at the time he was murdered. Defendant asserted that one of these individuals may be the same person who was seen walking away in an orange skull cap after the shots were fired. As to how the murder weapon ended up under the couch cushions at 217 Meadows after such a scenario, Defendant suggested that either the shooter ran through the house to stash the gun and then ran out the back door or the shooter dropped the gun on the sidewalk and another individual took the gun inside the house.

No other witnesses' testimony supported these hypotheses, and Jayedon testified that no one came in or went out of the house after the shots were fired. Mr. Hill testified that Elijah and Defendant ran inside immediately after the shots were fired, but he did not see anyone else enter the house and did not see anyone on the street when he got in his car to leave. Ms. Smothers testified that she saw Elijah and Defendant run inside 217 Meadows after the shots were fired, and she saw Mr. Hill leave, but she did not see anyone else.

After hearing all of the testimony and viewing the evidence, a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of the hypotheses of innocence suggested by the defense at trial, that Defendant was guilty of the second-degree murder of the victim, Mr. Fletcher. The State presented sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Defendant was the individual who shot the victim.

However, even if the jury did not find that the State proved beyond a reasonable doubt that Defendant was the actual shooter, the jury could have found that Defendant was a principal to second degree murder. Principals are all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission,

or directly or indirectly counsel or procure another to commit the crime. La. R.S. 14:24. An individual may only be convicted as a principal for crimes in which he personally has the requisite mental state; intent of the accomplice cannot be imputed to the defendant. *State v. Chattman*, 01-556 (La. App. 5 Cir. 10/30/01), 800 So.2d 1043, 1048, *writ denied*, 01-3320 (La. 12/19/02), 833 So.2d 332 (citing *State v. Brooks,* 505 So.2d 714 (La. 1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987)).

The jury was instructed that, to find Defendant guilty as a principal to second degree murder, the jury must find that Defendant had the specific intent to kill or commit great bodily injury. Louisiana courts have recognized that a defendant may possess the requisite intent even though he did not inflict the mortal injury. *Chattman*, 01-556, 800 So.2d at 1049 (citing *State v. Meyers*, 95-750 (La. App. 5 Cir. 11/26/96), 683 So.2d 1378, *writ denied*, 97-234 (La. 6/20/97), 695 So.2d 1350). Specific intent may be inferred from the circumstances and actions of the defendant. *State v. Graham*, 420 So.2d 1126 (La. 1982).

In *State v. Clarkson*, 11-933 (La. App. 3 Cir. 3/7/12), 86 So.3d 804, *writ denied*, 12-788 (La. 9/28/12), 98 So.3d 826, the Third Circuit found the defendant's actions sufficiently proved his guilt as a principal to second degree murder. There, rather than trying to aid the victim, the defendant urged others to leave the scene, left the scene himself, and watched the shooter bury the murder weapon. The defendant made no attempt to notify authorities of the murder and left town without reporting the crimes. Further, instead of making a voluntary attempt to aid in the apprehension of the murderer, the defendant lied to investigators, and only admitted to having knowledge of the murder when confronted with the evidence against him. *Id. See also State v. Page*, 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299 (Under the law of principals, the evidence was sufficient to support a second-degree murder conviction when

defendant remained with the shooter on the scene, did nothing to prevent the crime, fled the scene rather than going to the victim's aid, did not report the shooting, and had been seen discussing a robbery on the day of the murder).

In the instant case, the jury was presented with forensic evidence that established that Defendant contributed to the DNA found on the murder weapon. The victim's blood was found on Defendant's right shoe and right pant leg, and expert testimony established that Defendant had to be within feet of the victim at the time of the murder.

Despite this evidence, there was no indication that Defendant did anything to prevent the murder. Additionally, no one observed Defendant render assistance to the victim after the shooting, either prior to or after neighbors gathered on the street, nor did Defendant call 9-1-1 to report the incident. Witnesses testified that Defendant did not appear overtly distressed over the murder of his friend and that he made no attempt to check on the victim while waiting for officers to arrive. In fact, there was evidence that, rather than rendering aid or assistance to the victim or notifying authorities of the shooting, Defendant was seen fleeing into 217 Meadows Drive shortly after the shots were fired.

The residence Defendant was seen running into was the same residence in which the murder weapon was later found, and the jury was presented with evidence that Defendant entered that residence after officers arrived on the scene and that he was concerned when he believed officers were entering the residence without a search warrant.

Further, the forensic evidence supports a finding that Defendant made misrepresentations to officers when he claimed to have been inside during the shooting and when he denied having any knowledge of the gun on which his DNA was found. Defendant also ultimately left the state while the murder investigation was pending.

Finally, while his defense at trial hinged on the fact that someone else could have pulled the trigger, the forensic evidence supports the inference that Defendant must have seen the individual who shot the victim. Yet, Defendant told officers that he did not see or touch a gun and did not indicate that he saw anyone else with a gun. He stated that he did not know whether Elijah or any of the others had shot the victim. Thus, despite evidence establishing that he was within feet of the victim at the time of the shooting, Defendant provided no information to investigators regarding the identity of the shooter. Accordingly, we find that the State presented sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Defendant was guilty, either as the perpetrator or a principal, of second-degree murder. Finding that the evidence presented at trial was sufficient for a conviction, we now address Defendant's other assignments of error.

**Motion to Suppress Evidence:**

In his second assignment of error Defendant alleges that the trial court erred in partially denying his motion to suppress evidence during the pre-trial stages of this matter. Additionally, in his third assignment, Defendant assigns error to the trial court's decision to quash the defense's subpoenas for, and refusal to allow, lay witnesses to testify at the motion to suppress hearing. For the following reasons, we find little merit in these assignments of error.

(*Counseled Assignment 2*)

On July 24, 2018, Defendant filed a motion to suppress, arguing that he was illegally arrested when officers handcuffed him and placed him in a police unit on the morning of the murder, and he asserted that evidence acquired, derived, or tainted by the arrest should have been suppressed. The evidence subject to Defendant's motion to suppress included the following: (1) two cell phones seized

from Defendant, and any information derived therefrom;[60] (2) the November 19, 2017 MVR recording of Defendant's comments/statements; (3) Defendant's recorded statement taken at headquarters on November 19, 2017; (4) Defendant's clothing and shoes, as well as any lab results derived therefrom; (5) the DNA sample taken from Defendant and any lab results derived therefrom; and (6) the gun and Coors beer cans seized from 217 Meadows Drive on the day of the murder.

Additionally, Defendant makes a secondary argument that the clothes, shoes, DNA swab, and all evidence derived therefrom, should have been suppressed on grounds that the search warrant affidavits obtained for 217 Meadows and for the seizure of Defendant's clothing and DNA contained known factual errors and misleading information, and if the inaccurate information was excised from the affidavit, probable cause for the searches would not have existed on the face of the warrants.  Further, the Defendant argued that the misrepresentations were deliberate and made for the purpose of deceiving the magistrate, rendering the "good faith" exception to the probable cause requirement inapplicable and requiring suppression of the evidence in accordance with *State v. Horton*, 820 So.2d 556 (La. 2002).

A hearing on Defendant's motion to suppress was held over the course of three days: September 7, 2018; September 10, 2018; and October 19, 2018.  At the conclusion of the hearing, the trial court took the matter under advisement and, during a subsequent status hearing on December 4, 2018,  denied the suppression of statements made by Defendant on the scene, denied the motion to suppress the evidence obtained through execution of the two warrants, granted Defendant's motion to suppress his statement at headquarters obtained prior to his waiver of his

---

[60] Because no evidence derived from the cell phones was introduced at trial, we pretermit any discussion thereof as it would be moot.

rights, and then denied Defendant's motion to suppress statements made at headquarters after Defendant was read his rights

In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of any evidence seized without a warrant. *State v. Favors*, 09-1034 (La. App. 5 Cir. 6/29/10), 43 So.3d 253, 258, *writ denied*, 10-1761 (La. 2/4/11), 57 So.3d 309. However, when evidence is seized pursuant to a search warrant, the defendant bears the burden of proof at a hearing on his motion to suppress that evidence. La. C.Cr.P. art. 703(D); *State v. Falcon*, 13-849 (La. App. 5 Cir. 3/12/14), 138 So.3d 79, 88, writ denied, 14-769 (La. 11/14/14), 152 So.3d 877. The trial court is afforded vast discretion in ruling on a motion to suppress, and its ruling will not be disturbed unless the preponderance of the evidence clearly favors suppression. *State v. Every*, 19-40 (La. App. 5 Cir. 5/23/19), 274 So.3d 770, 777, *writ denied*, 19-1048 (La. 10/1/19), 280 So.3d 159. In reviewing the trial court's ruling on a motion to suppress, the appellate court is not limited to the evidence presented at the hearing, but may also consider any pertinent evidence presented at trial. *Favors*, 43 So.3d. at 258-59.

The Fourth Amendment to the U.S. Constitution and Article I, §5 of the Louisiana Constitution prohibit unreasonable searches and seizures. As a general rule, searches and seizures must be conducted pursuant to a validly executed search warrant or arrest warrant. *State v. Holmes*, 08-719 (La. App. 5 Cir. 3/10/09), 10 So.3d 274, 278, *writ denied*, 09-816 (La. 1/8/10), 24 So.3d 857. Warrantless searches and seizures are *per se* unreasonable unless justified by one of the exceptions to the warrant requirement. *Id.* If evidence is derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence at trial. *State v. Every*, 19-40 (La. App. 5 Cir. 5/23/19), 274 So.3d 770, 776, *writ denied*, 19-1048 (La. 10/1/19), 280 So.3d 159. When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence,

the State bears the burden of proving that the search and seizure was justified pursuant to one of the exceptions to the warrant requirement. La. C.Cr.P. art. 703(D); *State v. Joseph*, 02-717 (La. App. 5 Cir. 6/27/03), 850 So.2d 1049, 1052, *writ denied*, 04-2404 (La. 6/17/05), 904 So.2d 686.

As explained, on appeal, Defendant asserts that his clothing and shoes, as well as the gun found at 217 Meadows, were obtained after an illegal detention and arrest as officers lacked any search warrant or consent, and that no exception to the exclusionary rule[61] applies. Therefore, in order to sufficiently analyze Defendant's claims, as a preliminary matter, we turn to whether Defendant was illegally arrested, as alleged.

There are three tiers of interaction between the police and citizens as it relates to the Fourth Amendment. *State v. Fisher*, 97-1133 (La. 9/9/98), 720 So.2d 1179, 1182 (internal citations omitted). The first tier is mere communication between officers and citizens where there is no coercion or detention. *Id.* Such communication does not implicate the Fourth Amendment. *Id.* The second tier is the investigatory stop where the police may briefly seize a person if the officer has reasonable suspicion that the person is, or is about to be, engaged in criminal conduct, or is wanted for past criminal acts. *Id.* Finally, the third tier is a custodial arrest where the police must have probable cause to believe that the person has committed a crime. *Id.* Probable cause, also referred to as reasonable cause, necessary to validly make a full custodial arrest requires more than the "reasonable suspicion" needed for a brief investigatory stop. *Id.*

An arrest occurs when the circumstances indicate intent to affect an extended restraint on the liberty of the accused rather than at the precise time an officer tells

---

[61] The exclusionary rule bars, as illegal "fruit of the poisonous tree," any physical and verbal evidence obtained either during or as a direct result of an unlawful invasion; the rule extends to both primary evidence obtained during or as a direct result of an illegal search or seizure, as well as evidence later discovered and found to be a derivative of illegality. *State v. Salinas*, 17-485 (La. App. 5 Cir. 7/16/18), 251 So.3d 1166, 1174, *writ denied*, 18-301 (La. 4/8/19), 267 So.3d 614).

43

an accused he is under arrest. [62] *State v. Barker*, 19-223 (La. App. 5 Cir. 12/11/19), 285 So.3d 581, 589. However, arrest-like features such as the use of drawn weapons and handcuffs may, but do not invariably render the seizure a *de facto* arrest. *See State v. Lewis*, 12-902 (La. App. 5 Cir. 6/27/13), 121 So.3d 128, 136, *writ denied*, 13-1926 (La. 4/17/14), 121 So.3d 128. Whether a person has been arrested is determined by an objective test; neither the person's subjective impression nor the lack of formality of the arrest resolves the issue. *Fisher*, 720 So.2d at 1183. The determination depends on whether, under the totality of the circumstances, a reasonable person would not consider himself free to leave. *Id.*

In the present case, police officers, at the scene of an active investigation, restrained Defendant by handcuffing him in the back seat of the police car, which was bound for headquarters, where he was subsequently placed in shackles. Officer testimony indicates that Defendant neither entered the police car, nor went to headquarters voluntarily[63]; rather, it seems that Defendant was actively vocal that he did not want to be in the police unit at all. Nevertheless, Detective Dewhirst testified that Defendant was in shackles for officer safety.[64] However, he also testified that Defendant was not free to leave headquarters, and a review of Defendant's recorded statement shows that he advised Defendant of such.

Arrests have been found to have occurred in many similar situations. In *Fisher*, 720 So.2d 1179, the Louisiana Supreme Court found that the defendant in

---

[62] A seizure is an arrest, rather than an investigatory stop, when a reasonable person in the defendant's situation would have understood the situation to be a restraint on freedom of movement of the degree that the law associates with a formal arrest. *Barker,* 285 So.3d at 589. Although a seizure occurs for Fourth Amendment purposes either when an individual has been subjected to physical restraint or when he submits to the assertion of official authority, no bright-line rule exists for distinguishing between investigatory stops, characterized by brief restraint imposed on a lesser showing of reasonable suspicion, and arrests based on probable cause. *Id.*

[63] Detective Dewhirst initially testified that Defendant went to headquarters voluntarily; however, after being presented with the MVR footage showing Defendant's active objections, he admitted that Defendant was detained as a person of interest and that he had, for officer safety, directed Deputy Cosse to take Defendant to headquarters and shackle him there.

[64] Detective Dewhirst testified that, despite the fact that there were three officers interviewing Defendant, Defendant was kept in shackles during the interview for their safety, but that keeping Defendant shackled to the floor for the remainder of the day was merely an oversight.

44

that case, who was likewise handcuffed and placed in a police unit bound for the police station, had been subject to an arrest. The Supreme Court determined that no reasonable person in that position could believe that he was free to go. *Id.* The *Fisher* Court pointed out that the police officer's testimony that he intended to take the defendant to the police station indicated "an unmistakable intent to impose a restriction on defendant's liberty more extensive than an investigatory stop." *Id.* at 1184. Furthermore, in *State v. Kang*, 01-1262 (La. App. 5 Cir. 2/23/04), 566 So.2d 408, *writ denied*, 04- 944 (La. 11/24/04), 888 So.2d 226, this Court held that an arrest occurred where the defendant was handcuffed and placed in the back of a marked police unit before being transported to the detective bureau. In that case, as in the instant case, an officer testified that the defendant was not arrested at that time or when he arrived at the detective bureau; however, the officer also stated the defendant was not free to leave. *Kang*, 866 So.2d at 413-14.

Considering the totality of the circumstances, we find that Defendant could not have reasonably considered himself free to leave where he was handcuffed and placed in a police car to be transported to headquarters, despite his vocal objections, and subsequently transported to police headquarters where he was physically shackled and informed that he was not free to leave. Accordingly, the next matter for this Court to determine is whether officers had probable cause to arrest Defendant without a warrant.[65]

Probable cause to arrest exists when the facts and circumstances known to the arresting officer, or of which he has reasonable and trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. *State v. Barker*, 19-223 (La. App. 5 Cir. 12/11/19), 285 So.3d 581, 589. While mere suspicion is insufficient to justify an arrest, a police

---

[65] A warrantless arrest must be based on probable cause. *State v. Bazley*, 09-358 (La. App. 5 Cir. 1/11/11), 60 So. 3d 7, 25, *writ denied*, 11-0282 (La. 6/17/11), 63 So.3d 1039.

officer need not have sufficient proof to convict in order to arrest. *Id.* The determination of whether probable cause exists for an arrest is a purely objective inquiry that takes into account all the information collectively known to the law enforcement personnel involved in the investigation. *State v. Elliott*, 09-1727 (La. 3/16/10), 35 So.3d 247, 251. Probable cause can rest upon the collective knowledge of the police, rather than solely on that of the arresting officer, even if some information known to other officers is not communicated to the officer who actually makes the arrest. *State v. Cortez*, 11-041 (La. App. 5 Cir. 5/22/12), 98 So.3d 382, 392 (citations omitted).

In the instant case, we find that the officers lacked probable cause to arrest Defendant on the morning of the murder. The State alleges that probable cause existed where Defendant was present at the scene of the crime after the shooting and had informed them that he was with the victim in the hours leading up to the shooting and immediately before the shooting. The State further alleges that, despite Defendant's story that he was inside grabbing a beer when the shots were fired, an unidentified witness reported seeing an individual in an orange skull cap fleeing the scene after the shooting and Defendant was wearing an orange hat. Additionally, the State asserts that probable cause existed where Defendant attempted to leave the scene during the investigation and where he lacked any visible emotional response to the victim's death. However, we point out that the State made nearly identical arguments in support of a finding of reasonable suspicion, a lower standard than probable cause, justifying the seizure of Defendant's clothing and DNA.[66] As such, we are not persuaded that these arguments would be sufficient to convince a man of

---

[66] Both the State, in its brief, and Detective Dewhirst, through his testimony, have asserted that Defendant was merely detained upon reasonable suspicion as supported by the arguments above. We point out that even if this Court were to validly find that officers had such reasonable suspicion, as argued, that would still be insufficient to find probable cause.

ordinary caution that Defendant committed second-degree murder. *See Barker*, 285 So.3d at 589.

While Defendant admitted to having been with the victim on the night preceding the murder, he also indicated to officers that there had been various other individuals with them that evening. Also, Defendant's demeanor and state of mind on the scene were highly contested. Testimony both indicated that Defendant expressed a willingness to talk to detectives while on the scene, while simultaneously indicating that Defendant expressed that he wanted "nothing to do with this." Deputy Murray testified that Defendant was detached and emotionless. Conversely, at the motion to suppress hearing, Deputy Cosse described Defendant as "distraught," but then at trial, he testified that Defendant was neither crying, nor visibly upset about the victim's death. Deputy Murray, as well as various other witnesses at the scene, testified that Defendant was slurring his words and otherwise noticeably intoxicated, whereas Detective Dewhirst testified that Defendant was neither falling nor stumbling.

Likewise, the color of Defendant's hat was widely debated. At trial, Janae Smothers, a lay witness, testified that Defendant's beanie looked mustard colored everywhere except on the MVR footage. Deputy Cosse testified that the individual who gave him the description of the unidentified suspect fleeing the scene in an orange skull cap never suggested that Defendant, who was standing right there, was the person she saw. Additionally, none of the officers who heard the description while *en route* to the scene thought to apprehend Defendant as a suspect based on the color of his hat. Deputy Campuazano also testified to this same point, stating he would have noticed if Defendant was wearing an orange skull cap on scene, and that, if Defendant had been wearing an orange skull cap, he would have immediately detained Defendant.

We are also not convinced by the State's assertion that Defendant attempted to "flee" the scene, thus providing probable cause. MVR footage showed Defendant meandering about the scene for approximately twenty-three (23) minutes before he wandered beyond the crime scene tape, where he was found chatting with a group of bystanders who had gathered a couple of houses down the street. MVR footage also showed that Defendant asked to give a statement several times, which, had he been evading officers, he would not have done. Furthermore, Detective Murray actually testified that Defendant was not actively concealing himself from officers as he was exiting the crime scene area.

Therefore, under the totality of the relevant circumstances, we find that officers did not have probable cause to arrest Defendant on the morning of the murder; rather, taking into account all the information collectively known, this Court finds that officers merely had a suspicion that Defendant had information about the shooting, which was insufficient to justify arresting him. *See Barker,* 285 So.3d at 589; *Elliott*, 35 So.3d at 251.

Nevertheless, for the reasons we discuss below, we find that the trial court's partial denial of Defendant's motion to suppress was correct. As we previously discussed, the exclusionary rule bars, as illegal fruit, evidence obtained during, or as a direct result of, an unlawful invasion. *State v. Salinas*, 17-485 (La. App. 5 Cir. 7/6/18), 251 So.3d 1166, 1174, *writ denied*, 18-1301 (La. 4/8/19), 267 So.3d 614 (citing *State v. Nicholas*, 06-903 (La. App. 5 Cir. 4/24/07), 958 So.2d 682, 686-87). However, well-settled judicial doctrines have carved out exceptions to the exclusionary rule, including the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *Id.*; *U.S. v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *State v. Welch*, 449 So.2d 468 (La. 1984); *State v. Guy*, 575 So.2d 429 (La. App. 4 Cir.1991), *writ denied*, 578 So.2d 930 (La. 1991)).

As a preliminary matter, we address Defendant's contention that the trial court improperly denied his motion to suppress the statements he made at headquarters after he was informed of his rights. Although the burden of proof is generally on the defendant to prove the grounds recited in a motion to suppress evidence, such is not the case when the evidence sought to be suppressed is a confession. On a motion to suppress a confession, the burden of proof is with the state to prove the confession's admissibility. La. C.Cr.P. art. 703(D). To establish the admissibility of a statement made by an accused person during custodial interrogation, the State must prove that the accused had been advised of his or her *Miranda*[67] rights and that he or she waived those rights prior to interrogation. *State v. Seward*, 509 So.2d 413 (La.1987)*; State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). The determination of a statement's admissibility is within a trial court's discretion, and should not be disturbed unless it is clearly unsupported by the evidence. *Id.* Here, because the State established, through testimony and a signed and initialed advice of rights form, that Defendant was advised of his rights, and waived them, halfway through the interview, and the trial court suppressed the part of Defendant's statement made before he was given his rights, we decline to disturb the trial court's decision.

We next turn to the matter of the November 19, 2017 MVR recording. Defendant's statements obtained prior to the illegal arrest, as well as those made while Defendant was in the police unit, were spontaneous and voluntary; Defendant was not being questioned. Spontaneous and voluntary statements, even those made while in custody, are admissible without *Miranda* warnings so long as they are not made as a result of police interrogation or compelling influence. *State v. George*, 371 So.2d 762 (La.1979), *cert. denied,* 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325 (1979); *State v. Thornton,* 351 So.2d 480 (La.1977); *State v. Thomas,* 310 So.2d 517

---

[67] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d. 694 (1966).

(La.1975); *State v. Higginbotham,* 261 La. 983, 261 So.2d 638 (1972); *State v. Hall,* 257 La. 253, 242 So.2d 239 (1970). A determination as to the voluntary nature of an inculpatory statement is a question for the trial court that should not be disturbed unless unsupported by the evidence. *State v. Estes*, 14-781 (La. App. 5 Cir. 2/25/15), 168 So.3d 847, 859–60, *writ denied*, 2015-0654 (La. 2/5/16), 186 So.3d 1164. Accordingly, we likewise find that the trial court properly denied Defendant's motion to suppress the November 19, 2017 MVR recording of Defendant's spontaneous and voluntary statements.

We now address the evidence seized pursuant to valid search warrants, namely the murder weapon and the Coors beer cans seized from 217 Meadows Drive, as well as Defendant's clothing, DNA, and other serological evidence. [68]

Because the exclusionary rule bars any physical and verbal evidence obtained either during, or as a result of, an unlawful invasion, evidence collected pursuant to a valid search warrant is patently not an unlawful invasion. *See Salinas*, 251 So.3d at 1174; *Holmes*, 10 So.3d at 278.[69] Therefore, evidence retrieved pursuant to a valid search warrant is not considered an illegality or fruit of the poisonous tree. Likewise, when evidence is seized pursuant to a search warrant, the Defendant bears the burden of proof at a hearing on his motion to suppress that evidence. La. C.Cr.P. art. 703(D). The task for a reviewing court addressing evidence seized pursuant to a search

---

[68] In his brief, Defendant argues that "no Exclusionary Rule" exception applies to either Defendant's clothing and shoes, or to the gun found in 217 Meadows Drive. The State's brief appears to suggest the good faith exception set forth in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) is applicable. However, application of the good faith exception appears unnecessary in the present case in light of the probable cause analysis outlined herein. Nevertheless, we briefly mention that Defendant has not established a lack of good faith on the part of the Detective Barrette, Sergeant Pitchford, or Detective Dewhirst in their preparation and review of the search warrant application and affidavit. Further, Defendant has not presented evidence that the trial judge abandoned his neutral role in issuing the search warrant. We find that each search warrant affidavit and application contained sufficient information that an officer would reasonably have believed it to be valid. Moreover, Defendant never asserted bad faith on the part of the officers and crime scene technician who collected the evidence, and the jurisprudence presumes good faith. *State v. Maxwell*, 09-1359 (La. App. 1 Cir. 5/10/10), 38 So.3d 1086, 1092, *writ denied*, 10-1284 (La. 9/17/10), 45 So.3d 1056 (citing *State v. Shannon*, 472 So.2d 286, 291 (La. App. 1 Cir. 1985), *writ denied*, 476 So.2d 349 (La .1985)

[69] As previously explained, the exclusionary rule bars any physical and verbal evidence obtained either during or as a direct result of an unlawful invasion; evidence collected pursuant to a valid search warrant is patently not an unlawful invasion. *See Salinas*, 251 So.3d at 1174; *Holmes*, 10 So.3d at 278.

warrant is to ensure that under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. *State v. Gaubert*, 14-396 (La. App. 5 Cir. 12/16/14), 167 So.3d 110, 114. If the magistrate finds that the affidavit is sufficiently detailed and reliable to show probable cause, the reviewing court should interpret the affidavit in a realistic and common-sense fashion, being aware that it is normally prepared by non-lawyer police officers in the midst and haste of a criminal investigation. *Id*. Within these guidelines, courts should strive to uphold warrants to encourage their use by police officers. *Id.*

As stated above, an affidavit supporting a search warrant is presumed to be valid, and the Defendant has the burden of proving that the representations made in the affidavit are false. *Shiell*, 204 So.3d at 1217; *State v. Dee*, 09-712 (La. App. 5 Cir. 2/23/10), 34 So.3d 892, 899, *writ denied*, 10-705 (La. 10/29/10), 48 So.3d 1097. That burden requires the Defendant to prove by a preponderance of the evidence that the affidavit contains intentional misrepresentations. *Shiell*, 204 So.3d at 1217 (citing *State v. Mitchell*, 15-524 (La. App. 5 Cir. 12/9/15), 182 So.3d 365, 375). A material and intentional misrepresentation made in an affidavit presented to a magistrate constitutes a fraud upon the court and will result in the invalidation of the warrant and suppression of the items seized. *Shiell*, 204 So.3d at 1217 (citing *State v. Byrd*, 568 So.2d 554, 559 (La. 1990); *State v. Williams*, 448 So.2d 659, 663 (La. 1984)). However, if the misrepresentations or omissions are inadvertent, negligent, or are included without an intent to deceive, the correct procedure is for the warrant to be retested for probable cause after supplying that which was omitted or striking that which was misrepresented. *Id.* (citing *State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022, 1029, *cert. denied*, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000)).

51

Defendant argues that as a result of the "plain errors," the trial court in this case should have considered all evidence obtained via search warrant to be fruit of the poisonous tree. We disagree.[70]

In reference to the search warrant for 217 Meadows Drive, the errors cited in Defendant's brief are not contained in the affidavit prepared by Detective Barrette. Furthermore, review of the Meadows Drive affidavit shows no reliance on statements made by, or information obtained from, Defendant after his illegal arrest on the day of the shooting.[71] Rather, the Meadows Drive affidavit indicates that deputies and detectives responded to a murder investigation on November 19, 2017, and located the victim near the sidewalk in front of the residence. According to the Meadows Drive affidavit, while making contact with the tenant of 217 Meadows Drive (Ms. Powell) to speak with her in reference to the homicide, detectives detected a strong smell of marijuana emitting from the apartment. Ms. Powell refused to answer questions and stated that no one was entering her apartment without a search warrant. Upon considering the location of the homicide, the strong smell of marijuana emanating from the apartment, and the fact that Ms. Powell might have information or evidence that could assist with the murder investigation, Detective Barrette requested a search warrant for the apartment located at 217 Meadows Drive.

Defendant points to no specific misrepresentations in the Meadows Drive affidavit, and no misrepresentations are readily apparent from review of the document. The Meadows Drive affidavit references no information allegedly provided by Ms. Jones, it does not assert that Defendant agreed to return to

---

[70] Defendant does not cite the authorities on which he relies for his argument that the evidence should be excluded as fruit of the poisonous tree. He also does not provide the applicable law for reviewing the search warrant anew or law pertaining to the inevitable discovery rule. *See* Uniform Rules of Court – Courts of Appeal, Rule 2-12.4.

[71] The facts establishing probable cause for the warrant must be contained within the four corners of the affidavit. *State v. Shiell*, 204 So.3d at 1217.

headquarters, and it does not reference the color of Defendant's hat.[72] Defendant

has not met his burden of proving that representations made in that affidavit are false.

Therefore, this Court finds that the gun and Coors beer cans seized from 217

Meadows were constitutionally seized pursuant to a valid search warrant.[73]

We likewise find that Defendant's clothing and DNA were constitutionally

seized pursuant to a valid search warrant for DNA and serological evidence.[74]

However, upon review of the application requesting a warrant for search and seizure

of Defendant's outer clothing and DNA, we find that the application prepared and

submitted by Detective Dewhirst contained erroneous information. *See Shiell*, 204

So.3d at 1217; *see also Dee*, 34 So.3d at 899.

Detective Dewhirst's warrant application improperly stated that Ms. Jones

described seeing Defendant, wearing an orange skull cap, in front of 217 Meadows

Drive just after hearing shots.[75] Deputy Cosse indicated that Ms. Jones was not the

witness who described seeing an individual wearing an orange skull cap. Based

upon the phone call between Ms. Jones and defense counsel, which was played at

the suppression hearing and later admitted into evidence, Ms. Jones neither

described Defendant's clothing to officers on the morning of the murder, nor saw

Defendant in front of 217 Meadows Drive after hearing gunshots. Rather, during

the phone call, Ms. Jones stated that she observed Defendant come outside from

---

[72] The improper allegations regarding Defendant were only in the application requesting a warrant for search and seizure of Defendant's outer clothing and DNA.

[73] At the suppression hearing, Sergeant Walsh, Detective Barrette, Detective Plaisance, Sergeant Pitchford, Detective Dewhirst, and Deputy Weems testified to personally smelling marijuana emanating from 217 Meadows Drive. At trial, Ms. Powell confirmed that she smelled marijuana in her house on the morning of the murder. Thus, the information contained in the Meadows Drive affidavit is clearly supported by testimony elicited at the suppression hearing and trial. Furthermore, the odor of marijuana emanating from inside the residence established probable cause for the search warrant under the plain-smell exception (an extension of the plain-view exception). *State v. Gray*, 13-1326 (La. 6/28/13), 122 So.3d 531, 532 (*per curiam*).

[74] Defendant argued that the warrant did not state, with particularity, the place to be searched and the items to be seized when it sought permission to search Defendant's person for "serological samples and DNA," and included a request to secure Defendant's outer clothing as evidence. The word "serological" refers to blood and other bodily fluids. Therefore, if the police suspected that Defendant had been in close proximity to the victim at the time he was murdered, probative evidence, such as trace amounts of blood, may have been preserved on Defendant's outer clothing. Therefore, the warrant issued to search for serological samples and DNA properly authorized the seizure of Defendant's clothing.

[75] In its brief, the State concedes that such information was incorrectly attributed to Ms. Jones.

within 217 Meadows after she exited her own residence.[76] At the suppression hearing, Deputy Yancy and Detective Plaisance likewise indicated that Ms. Jones said she saw Defendant exit a residence after she was outside. According to Deputy Yancy, Ms. Jones did not tell him that she saw Defendant wearing an orange hat. Detective Dewhirst testified that at the time of the suppression hearing, he could acknowledge that someone other than Ms. Jones reported seeing someone walking away wearing an orange skull cap. Detective Dewhirst's warrant application was further erroneous in stating that Defendant had voluntarily returned to headquarters. As stated above, MVR footage from the crime scene, as well as testimony from various officers, including Deputy Cosse, Deputy Harrell, and Sergeant Walsh, clearly indicated that Defendant did not want to be placed in the police unit and did not want to be transported to headquarters.

Nevertheless, we do not find that Defendant met his burden of proving, by a preponderance of the evidence, that the search warrant affidavit contains intentional misrepresentations. *Shiell*, 204 So.3d at 1217. The trial court had the opportunity to hear witness testimony[77] and make credibility determinations on the motion to suppress evidence. *See State v. Murphy*, 14-137 (La. App. 5 Cir. 10/15/14) 181 So.3d 1, 8. This Court does not reweigh the trial court's assessment of witness testimony on appeal. *Id.* We likewise find that the totality of the testimony elicited at the suppression hearing indicates that the information provided in the outer

---

[76] Ms. Jones provided similar information at trial.

[77] Detective Dewhirst testified that while he was on scene, he did not know that Ms. Jones and the witness who saw someone walking away in an orange skull cap were two different people. He also testified that he did not recall a conversation with Deputy Campuzano and that he avidly believed that Detective Plaisance told him that Ms. Jones said Defendant was wearing an orange skull cap. He further testified that he did not knowingly and intentionally merge the statement of Ms. Jones and an unknown woman and create a false and misleading narrative to present to the magistrate. Moreover, Detective Dewhirst testified that he was not aware that Defendant did not agree to return to headquarters for an interview until at least two weeks later after he reviewed the MVR footage. Sergeant Walsh also provided testimony that he told Detective Dewhirst that he observed Defendant wearing an orange skull cap. Likewise, Sergeant Pitchford testified that the application for Defendant's clothing and DNA was based on the information available to detectives at the time the application was submitted and that it was not his intention to confuse, mislead, or misinform a judge.

clothing and DNA application was based on Detective Dewhirst's understanding of the collective knowledge available to officers at the time the application was submitted. Because we do not find that the misrepresentations were necessarily inadvertent, negligent, or were included without an intent to deceive, the correct procedure is for us to retest the warrant for probable cause excising that which was misrepresented. *Shiell*, 204 So.3d at 1217; *State v. Culotta*, 343 So.2d 977, 982 (La. 1976) [78]

Accordingly, although the search warrant application contained suppressed statements, we find that Defendant's clothing, DNA, and other serological evidence were constitutionally seized pursuant to a valid warrant. Even after the erroneous information[79] is excised from Detective Dewhirst's warrant application, the search warrant application set forth probable cause that evidence could be found within Defendant's DNA and outer clothing. The warrant application informed the judge of the following facts: on November 19, 2017, Detective Dewhirst responded to Meadows Drive to assist with the investigation of a homicide; the victim was located in the driveway of 217 Meadows Drive, face down, positioned on his left side with both arms under his chest with his hands inside his jacket pockets; three .45 caliber casings were found in the area around the victim; Defendant was observed speaking with officers near the scene; Defendant confirmed that he was with the victim and two others just prior to the shooting; video footage from the Shell station showed the victim with Defendant and two other black males; and an empty .45 caliber semi-

---

[78] *Culotta*, 343 So.2d at 982 ("We do not believe that the scope of the constitutional provision was necessarily intended to exclude from the trial evidence otherwise untainted, secured through a search warrant, because part of the showing made in the affidavit used to secure the warrant is based upon evidence illegally obtained from third persons and inadmissible…"); *State v. Turner*, 16-1841 (La. 12/5/18), 263 So.3d 337, cert. denied, -- U.S. --, 140 S.Ct. 555, 205 L.Ed.2d 355 (2019).

[79] Defendant also argues that the cap he wore while at the crime scene and while being detained was gold. However, based on the inconsistency of the testimony, we decline to address whether such fact, as provided in the warrant, was actually erroneous where, assuming that it was and excising such information, we still find that officers had probable cause for a warrant.

automatic handgun with its slide locked back was recovered under the cushions of a sofa in the rear of Ms. Powell's residence.[80]

Further, officers developed information that Defendant had been seen exiting Ms. Powell's residence after the homicide. In that same residence, officers located an empty firearm of the same caliber as casings located in the area of the victim. Additionally, the search warrant application provided information that Defendant tried to leave the crime scene and had to be convinced to return with detectives. Given that Defendant was one of the last people with the victim prior to the shooting and was seen exiting the residence where a potential murder weapon had been found, combined with his attempt to leave the scene, we find that the search warrant application set forth probable cause that evidence could be found within Defendant's DNA and outer clothing.

Therefore, this Court affirms the trial court's partial denial of Defendant's motion to suppress and now turns to his next assignment of error regarding the motion to suppress hearing.

(*Counseled Assignment 3*)

In his third assignment of error, Defendant asserts that the trial court violated his constitutional right to present a complete defense at all stages of the proceedings, which he alleges includes the right to file a motion to suppress illegally obtained evidence, as well as to call "all relevant witnesses" to support that motion.

On September 6, 2018, in a hearing on the State's motion to quash the subpoenas issued to Ms. Jones and Ms. Powell, the trial court ruled that the two lay witnesses would not be allowed to testify at the suppression hearing. Still, on September 7, 2018, Ms. Powell voluntarily appeared at the hearing on the motion to suppress. The State re-urged its motion to quash alleging that Defendant did not

---

[80] In addition to excluding the information obtained during Defendant's interview at headquarters, the above probable cause discussion also excludes information improperly attributed to Ms. Jones, as well as the incorrect information that Defendant agreed to return to headquarters for the interview.

have a right to confrontation of the witness during a pre-trial hearing, while Defendant contended that Ms. Powell was merely being called as a witness to provide relevant evidence, which happened to be favorable to the defense. The trial court sustained the State's objection to Ms. Powell testifying. The trial court advised defense counsel that Ms. Powell would be allowed to proffer Ms. Powell's testimony at the end of the day. Defense counsel objected on the basis that there was no guarantee Ms. Powell would be available to testify, but was overruled by the trial court. However, by the time Defendant was afforded the opportunity to proffer her testimony, Ms. Powell was no longer present at the hearing. Although the trial court indicated that Defendant would be allowed to proffer Ms. Powell's testimony at a later time during the suppression proceedings, it appears this was not done.

On appeal, Defendant argues that he intended to call two witnesses to directly rebut the police officers pertaining to the search warrant affidavit. Defendant additionally asserts that by quashing the subpoenas issued by the defense, the trial court further limited his right to present a defense and have a fair hearing on the motion to suppress. Defendant argues this error was compounded by only allowing the defense to proffer testimony despite the fact that Ms. Powell appeared voluntarily at the hearing.

Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal Defendant the right to present a defense. *State v. Adams*, 11-1052 (La. App. 5 Cir. 5/16/13), 119 So.3d 46, 53, *writ denied*, 13-1413 (La. 12/6/13), 129 So.3d 531 (citing *State v. Lirette*, 11-1167 (La. App. 5 Cir. 6/28/12), 102 So.3d 801, 813, *writ denied*, 12-1694 (La. 2/22/13), 108 So.3d 763). This right does not require a trial court to permit the introduction of evidence that is inadmissible, irrelevant, or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. *Id.* "When the trial court excludes evidence, such as witness testimony,

error may not be predicated upon a ruling unless a substantial right of the party is affected, and the substance of the evidence was made known to the court by counsel." La. C.E. art. 103. *See also State v. Massey*, 11-358 (La. App. 5 Cir. 03/27/12), 97 So.3d 13, 28, *writ denied*, 12-993 (La. 9/21/12), 98 So.3d 332. This Court has consistently held that when a defendant fails to make known the substance of the excluded evidence for the purpose of consideration by the trial and appellate court, the alleged error is not preserved for review on appeal. *Id.* The trial court is accorded great discretion in evidentiary rulings and, absent a clear abuse of that discretion, rulings on admissibility of evidence will not be disturbed on appeal. *State v. Magee*, 11-0574 (La. 9/28/12), 103 So.3d 285, 321, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013).

In the present case, we cannot find the trial court abused its discretion in quashing Defendant's requested subpoenas for Ms. Jones and Ms. Powell, where, as pointed out by the State, the Louisiana Supreme Court has explicitly held that compulsory process for obtaining witnesses is not guaranteed during a pre-trial hearing such as the instant hearing on Defendant's motion to suppress. *Weathersby*, 29 So.3d at 501; *Harris*, 998 So.2d at 56. We, however, point out that there is an apparent inconsistency in the law where, pursuant to La. C.Cr.P. art. 731, "The court *shall* issue subpoenas for the compulsory attendance of witnesses at hearings or trials when requested to do so by the State or the Defendant." (Emphasis added). Nevertheless, this inconsistency is insufficient for this Court to find that the trial court committed an abuse of discretion in the instant case.[81]

---

[81] Defendant relies upon on *State v. Wilson*, 17-908 (La. 12/05/18), 2018 WL 6382169, arguing, "In their motion, the state cited *State v. Harris*…and *State v. Weathersby*…for the proposition that the defendant's right to confront his accusers is only afforded at trial and not at pretrial matters. The state's argument is misguided. *State v. Wilson*…" Defendant points to no particular holding of *Wilson* to support his contention. *Id.* Further, upon reading *Wilson*, this Court fails to see how or why *Wilson* supports the allegation that the State's argument is misguided where that case deals with improperly excluded trial testimony. Further, Defendant does not address the part of the *Weathersby* holding in which the Supreme Court plainly stated that a defendant's "right to have compulsory process" is not secured during a pre-trial hearing. *Weathersby*, 29 So.3d at 501.

Furthermore, Defendant has not shown that the exclusion of the witnesses' testimony actually deprived him of his right to present a defense. While Defendant did not make a formal proffer of Ms. Jones' testimony at the suppression hearing, he was permitted to present a recorded phone conversation between defense counsel and Ms. Jones setting forth the information which she allegedly would have testified to at the hearing.[82] The phone call was played during the hearing and transcribed into the hearing transcript, and the audio and a transcript of the phone call were entered into the record as defense exhibits. Additionally, officers testified that the information provided by Ms. Jones differed from the information attributed to her in the search warrant application for Defendant's outer clothing and DNA.

Thus, through the recorded phone conversation and officer testimony admitting the inconsistencies in the warrant application, we find that Defendant was sufficiently afforded the opportunity to present evidence and develop arguments both countering and rebutting the claims set forth in the applications for search warrants. Accordingly, we also find that the trial court did not abuse its discretion in excluding Ms. Jones' testimony where her recorded statement and officer testimony both conveyed the information to be elicited from Ms. Jones.

As explained above, Ms. Powell was unable to provide proffered testimony. Nevertheless, the substance of Ms. Powell's testimony was made known to the court. During the hearing on the motion to quash the subpoenas, Defendant argued that Ms. Powell did not say, "I know," to Sergeant Pitchford.[83] During the course of the suppression hearing, Defendant proffered an affidavit signed by Ms. Powell

---

[82] Defendant neither proffered nor provided any information or argument as to how Ms. Jones' testimony would have differed from the evidence admitted through the recorded phone conversation.

[83] Although Ms. Powell's recorded statement did not directly address whether she stated, "I know," to Sergeant Pitchford, Ms. Powell indicated that she had no knowledge of the murder. She also provided no information that she knew Defendant had been in her home. Thus, it appears Ms. Powell's transcribed statement provided information that rebutted the contents of the search warrant affidavit. Additionally, Defendant had the opportunity to cross-examine Sergeant Pitchford regarding his conversation with Ms. Powell, and Defendant was able to cross-examine other officers who were present during Sergeant Pitchford's conversation with Ms. Powell. Further, through officer testimony and Kyla Bradley's transcribed statement, the trial court received evidence that Ms. Powell discussed the murder during a phone call she received prior to answering the door.

declaring the same. Defendant also entered into evidence Ms. Powell's recorded statement to detectives, which Defendant offered as "corroboration, complete corroboration, of what is contained in [Ms. Powell's] affidavit dated July 18th 2018." Moreover, through the introduction of the transcript of Ms. Powell's recorded statement into evidence, Defendant was allowed to present evidence in support of its defense. Defendant introduced evidence that Ms. Powell was unaware of the events that transpired prior to speaking with police and he presented evidence that the application to obtain the search warrant for Defendant's outer clothing and DNA contained incorrect information or a misrepresentation; thus, the trial court was provided with information from Ms. Powell that rebutted officer testimony. Accordingly, despite Ms. Powell's absence when Defendant was given the opportunity to proffer her testimony, we find that Defendant made the substance of Ms. Powell's testimony for review known to the trial court; in other words, we find that the trial court's ruling that Ms. Powell would not be permitted to testify at the suppression hearing did not unconstitutionally deny Defendant the right to present a defense.

**Non-Unanimous Jury Instruction:**
(*Pro se Assignment 1*)

Defendant's first *pro se* assignment of error challenges the constitutionality of the guilty verdict in his case. Specifically, Defendant makes two arguments.

Defendant first argues that, in light of the United States Supreme Court decision in *Ramos v. Louisiana*, 590 U.S.--, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020), the jury was unconstitutionally permitted to find him guilty through the use of a non-unanimous verdict. Upon review of the jury polling slips, however, the jury verdict convicting Defendant of a serious offense *was*, in fact, unanimous. Accordingly, *Ramos* is inapplicable to the instant case where it indicates that Louisiana defendants who were convicted of serious offenses by non-unanimous

juries, and whose cases are still pending on direct review, are entitled to a new trial. *See e.g., Ramos*, 590 U.S. -- (2020). Therefore, this argument presents nothing for this Court to review.

Accordingly, we turn to Defendant's second argument, in which he asserts structural error. As Defendant's trial occurred prior to the *Ramos* decisions, jurors were instructed in accordance with the old law; namely, that they could legally reach a verdict of guilty if ten of twelve jurors agreed. *See* La. C. Cr. P. art. 782 (*repealed*). Defendant contends that the instruction itself was unconstitutional, structural error, entitling Defendant to a new trial.

While Defendant is correct that unanimity is required for the jury to convict him of murder, under the circumstances of this case, we conclude that the instructional error was harmless. Despite the trial court's instruction that the jury *could* reach a non-unanimous verdict for murder, the jury returned a unanimous guilty verdict.

In *State v. Langley*, 06-1041 (La. 5/22/07), 958 So.2d 1160, 1164, *cert. denied*, 552 U.S. 1007, 128 S.Ct. 493, 169 L.Ed.2d 368 (2007), the Louisiana Supreme Court distinguished between "trial errors," which may be reviewed for harmless error, and "structural errors," which defy analysis by harmless error standards. It stated that structural defects occur in only "a very limited class of cases," which include: (1) the total deprivation of the right to counsel; (2) a biased trial judge; (3) unlawful exclusion of grand jurors of defendant's race; (4) denial of self-representation at trial; (5) denial of a public trial; and (6) a defective reasonable doubt instruction. *See Langley*, 958 So.2d at 1167 (internal citations omitted).

The *Langley* Court stated, "[w]hen the Supreme Court speaks of a structural defect, it means that "the entire conduct of the trial from beginning to end is obviously affected by the [error]." *See id.* This is undoubtedly not the case in the instant matter. Not only was the jury instruction regarding non-unanimous verdicts

61

in accordance with the law at the time of the trial, the verdict remained unaffected by the error where Defendant was convicted unanimously. Further, the complained of error, namely an instruction to the jury, does not fall within any of the six enumerated classes of cases. Moreover, we recognize, and agree with, our colleagues on the First and Third Circuits who have previously held that such errors in jury instructions constitute harmless error where a unanimous verdict was returned. *See State v. Primeaux*, 19-841 (La. App. 3 Cir. 10/21/20), 2020 WL 6155269 at *10; *see also State v. Swan,* 18-320 (La. App. 1 Cir. 12/17/18), 2018 WL 6599023 at **29 (unpublished opinion), *writ denied*, 19-151 (La. 5/20/19), 271 So.3d 1270).

Accordingly, we find, this was not structural error, and because Defendant was convicted by a unanimous jury, *Ramos* does not apply.

**Trial by Ambush:**
(*Pro se Assignment 2*)

Through his second *pro se* assignment of error, Defendant alleges that his right to a fair and impartial trial under the Sixth Amendment to the Constitution of the United States of America was violated through a "trial by ambush" when the State introduced undisclosed expert opinion evidence. Defendant argues that the prosecution failed to give defense adequate notice of its expert, Chief Scanlan, where the prosecution only notified defense of its intent to retain Chief Scanlan as an expert 42 hours prior to trial, via email. Defendant further contends that the prosecution failed to ever provide the defense with a copy of Chief Scanlan's expert report. Defendant alleges that as a result of this "trial by ambush," he was prejudiced because, due to the last-minute changes, his trial counsel was unable to properly prepare a defense.

Upon review of the record, including the transcripts from all preliminary hearings and trial, we point out that defense counsel never objected to the expert

62

status qualification of Chief Scanlan. Furthermore, counsel does not object to the admission of his expert report into evidence.

We point out that the only objection made by defense counsel regarding Chief Scanlan's expert testimony was an objection to the prospect of Chief Scanlan's oral testimony extending beyond the conclusions drawn in his written report. Specifically, upon the identification of Chief Scanlan during a pre-trial status hearing in March of 2019, prior to the receipt of his written report, defense counsel complained that without any report or a complete summary clarifying the scope and subject matter of Chief Scanlan's testimony, she would not be able to properly formulate a theory of defense. However, the April, 2019 email to which Defendant refers, was not an email identifying Chief Scanlan; rather, it was an email, sent after the expert report had already been exchanged, which expounded upon the scope and subject matter of his expected expert testimony at trial. However, we reiterate, no objection was made as to the admission of the report itself.

An irregularity or error cannot be availed of after a verdict unless it was objected to at the time of occurrence. La. C.Cr.P. art. 841. In order to seek appellate review of an alleged trial court error, a party must make a contemporaneous objection at trial and he must state the grounds for the objection. *Id; see also State v. Evans*, 19-237 (La. App. 5 Cir. 6/3/20), 298 So.3d 394, 405. Therefore, to the extent that Defendant complains of Chief Scanlan's classification as an expert and/or to the admission of Chief Scanlan's written report, as well as the information contained therein, these matters have not been properly preserved for appeal. *See* La. C.Cr.P. art. 841. Accordingly, we find that arguments regarding Chief Scanlan's qualifications and the admission of his expert report have been waived and these issues may not be reviewed, nor considered by this Court.

**Motion _in Limine_ to Exclude Character Evidence:**
(_Pro se Assignment 3_)

In his third and final _pro se_ assignment of error, Defendant asserts that the trial court erred in granting the State's motion _in limine_ to exclude character evidence. He argues that the prohibition against evidence of Elijah and Mr. Smith's prior arrests, which did not result in convictions, constituted "an unconstitutional penalization of his fundamental constitutional right to present a defense." Defendant, again, however, has assigned error to a matter not properly before this Court.

After the State's motion _in limine_ regarding character evidence was granted on April 3, 2019, defense counsel orally noticed its intent to seek supervisory review from the trial court's ruling. The next day, on April 4, 2019, defense counsel filed a written notice of its intent to seek a writ of certiorari from the trial court's ruling granting the motion and likewise filed a writ application here with this Court. On April 4, 2019, this Court denied defendant's writ application, finding "the trial court did not abuse her broad discretion in precluding the defense from inquiring into a witness' arrest for an unrelated event that occurred six months prior to the incident in question." _See State v. Williams_, 19-162 (La. App. 5 Cir. 4/4/19) (unpublished writ decision).

Under the law of the case doctrine, "a court should not reopen issues decided in earlier stages of the same litigation." _Agostini v. Felton,_ 521 U.S. 203, 236, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997). Pursuant to this discretionary doctrine, reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. _Falcon_, 13-849, 138 So.3d at 87-88 (citing _State v. Pettus_, 11-862 (La. App. 5 Cir. 5/22/12), 96 So.3d 1240).

Defendant's brief does not allege any new facts or additional jurisprudence that would suggest that this Court's previous determination was patently erroneous or created an unjust result. *See State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 15 (where this Court applied the law of the case doctrine to its previous ruling finding that the trial court correctly denied the defendant's motion to suppress where the defendant failed to cite any new facts adduced at trial or additional jurisprudence). Further, there does not appear to have been further information discovered at trial pertinent to this issue. Because it appears that no new evidence or jurisprudence was presented that would alter this Court's previous determination, under the law of the case, we decline to reconsider our previous ruling on this issue. This assignment of error is without merit.

## ERROR PATENT DISCUSSION

This Court routinely reviews the record on appeal for errors patent regardless of whether the defendant makes such a request. La. C.Cr.P. art. 920[84]; *State v. Dufrene*, 20-290 (La. App. 5 Cir. 12/9/20) 20 WL 7240361 at \*\*8-9; *State v. Oliveaux, 312 So.2d 337* (La. 1975); *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

Upon review, we find that there is a discrepancy between the sentencing transcript, the minute entry dated July 22, 2019, and the Louisiana Uniform Commitment Order ("UCO"). The sentencing transcript and the minute entry reflect that the trial court-imposed Defendant's sentence without the benefit of probation, parole, or suspension of sentence. However, the UCO fails to indicate that Defendant's sentence shall be served without such benefits. Rather, the section of the UCO indicating the number of years to be served without benefit of parole, probation, or suspension was left blank.

---

[84] La. C.Cr.P. art. 920(2) states that an errors patent is "[a]n error that is discoverable by an inspection of the pleadings and proceedings and without inspection of the evidence."

Accordingly, we find that the UCO is inconsistent with sentencing minute entry and sentencing transcript. The transcript prevails. *See State v. Lynch*, 441 So.2d 732, 734 (La. 1983); *State v. Montero*, 18-397 (La. App. 5 Cir. 12/19/18), 263 So.3d 899, 909. Therefore, this matter is remanded to the trial court with instructions for the trial judge to correct the UCO to conform to the sentencing transcript and minute entry. We also instruct the Clerk of Court for the 29th Judicial District Court to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2), and to the Department of Corrections' legal department. *See State v. Doucet*, 17-200 (La. App. 5 Cir. 12/27/17), 237 So.3d 598, *writs denied*, 18-77 (La. 10/8/18), 253 So.3d 789 and 18-196 (La. 11/5/18), 255 So.3d 1052, *cert. denied*, -- U.S.--, 139 S.Ct. 2676, 204 L.Ed.2d 1079 (2019); *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17), 215 So.3d 473, 479.

## CONCLUSION

For the aforementioned reasons, we affirm Defendant's conviction and sentence.

## CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTIONS

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 30, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**20-KA-46**

**E-NOTIFIED**
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE M. LAUREN LEMMON (DISTRICT JUDGE)
LOUIS G. AUTHEMENT (APPELLEE)          JANE L. BEEBE (APPELLANT)          GRANT L. WILLIS (APPELLEE)

**MAILED**
HONORABLE JEFFREY M. LANDRY          JAKOREY WILLIAMS #719513          HON. JOEL T. CHAISSON, II (APPELLEE)
(APPELLEE)                                              (APPELLANT)                                DISTRICT ATTORNEY
ATTORNEY GENERAL                            LOUISIANA STATE PENITENTIARY    TWENTY-NINTH JUDICIAL DISTRICT
LOUISIANA DEPARTMENT OF JUSTICE    ANGOLA, LA 70712                        COURT
1885 NORTH 3RD STREET                                                                      POST OFFICE BOX 680
6TH FLOOR, LIVINGSTON BUILDING                                                      HAHNVILLE, LA 70057
BATON ROUGE, LA 70802